## WILMINGTON TRUST CO. v. MUTUAL LIFE INS. CO. OF NEW YORK.

### Civ. A. No. 499.

District Court, D. Delaware.

Feb. 18, 1948.

As Amended March 2, 1948.

E. Ennalls Berl, William S. Potter and Vincent A. Theisen (of Southerland, Berl & Potter), all of Wilmington, Del., and Donovan, Leisure, Newton & Lumbard, of New York City, for plaintiff.

James R. Morford (of Marvel & Morford), of Wilmington, Del., Charles I. Thompson, of Philadelphia, Pa., and Louis W. Dawson, of New York City, for defendant.

LEAHY, District Judge.

Summary judgment was to have been entered in favor of defendant, but leave was granted plaintiff to amend the complaint which it did. See D.C., 68 F.Supp. 83. Plaintiff now claims that the aviation rider appearing in the policies in suit refers to civilian flying only and, as there is no provision in the policy excluding liability for war service, plaintiff should recover. The argument is that since death from military flight had been specifically excluded generally in the industry by war riders, it shows that military flights were not excluded before in the insured's policy. To sustain plaintiff's contention it must appear the insured was engaged in war service.

I shall refer to only those facts which are essential to the issue; they are not in dispute; and the matter is here finally upon cross motions of the parties for summary judgment.

The insured was killed in 1943 as a result of riding as an observer in the testing of an army experimental transport glider. The risk assumed by defendant was limited by the following aviation clause:

"Death as a result of operating or riding in any kind of aircraft, whether as a passenger or otherwise, except riding as a fare-paying passenger in a licensed passenger aircraft provided by an incorporated passenger carrier and operated by a licensed pilot on a regular passenger route between definitely established airports, is a risk not assumed under this Policy and if the Insured shall die as a result, directly or indirectly of such operating or riding in an aircraft the amount payable shall be limited to the reserve held at the date of death for the face amount of this Policy and for any dividend additions. Any accumulated dividend deposits will be payable in addition to such reserve."

The reserve and dividend additions were paid pursuant to stipulation and the sole issue on the prior motions for summary judgment was whether defendant might, under Delaware law, thus limit its coverage. This question was decided in favor of defendant. The present and amended pleading of plaintiff alleges: "That the flight of the said glider from which the said Richard C. duPont was descending at the time of his death was a military flight which was not within the terms or purview of the aviation clause contained in said policy of insurance, which said aviation clause is restricted to non-military flying and refers only to death as a result of operating or riding in aircraft not engaged in military flight."

On April 19, 1943, Richard duPont, the insured, wrote to General Arnold. This letter showed it was the result of many prior conferences which he had had with Arnold and his staff. It suggests a program for the reorganization of the glider program for the Army Air Forces. Time was of the essence. It appeared the program should should be carried out by "a special executive". He would be most effective "if appointed as a Special Civilian Assistant" on Arnold's staff, with no military rank. The insured received such an appointment. I shall not pause to recite all the facts which point to military service as opposed to civilian service. In sum, everything which had to do with duPont's service under the appointment was distinctively military. At this point I prefer to look back at the past before finding whether he was in the military service.

Two years before the policies in suit were written, in 1933 duPont went to California to study aviation engineering. While there he became associated in business with one Hawley Bowlus, who was a designer and builder of gliders and sailplanes. Prior to 1933, duPont had become a licensed pilot and owned and flew his own plane both for pleasure and in connection with his business.

While in California in 1933 duPont and Bowlus formed a corporation for the purpose of manufacturing and selling gliders. From this beginning, duPont acquired increasing fame as a glider expert, competed in soaring meets and became the holder of world records for sustained glider flight. About a year prior to the issuance of the policies in suit duPont bought out Bowlus. duPont moved the headquarters of the glider business to Wilmington. At the time the applications for the policies were made, duPont was actively engaged in glider activities, and was endeavoring, through an association of which he was a member, to build up interest in soaring and had expressed the hope (communicated to the defendant insurance company prior to the writing of the policies) of procuring an order for gliders from the Army or Navy. During the three years immediately preceding the application for the policies duPont had flown some 90,000 miles and spent 900 hours in the air for pleasure, and, in connection with his business. It was with a knowledge of all of the foregoing facts that defendant inserted the aviation exclusion clause in the duPont policies on June 26, 1935.

Following the issuance of the policies both duPont and Bowlus continued their glider activities.

Subsequent to his appointment as assistant to Arnold, duPont completed a set of Civil Service Forms and completed the official appointment pursuant to § 8 of the Military Appropriations Act of 1943, 56 Stat. 611, 631, on a per diem of $25.00 for each day worked. This provision of the Act authorizes the War Department, when necessary, to engage civilian technical and professional specialists. Thereafter from time to time duPont, when the glider program required his presence at specific places, applied for and received travel orders from the Civilian Personnel Division permitting him to travel to such places.

On September 6, 1943, duPont requested a travel order permitting him to leave Washington on September 8th to travel to California in connection with a special project for the glider program. This order was duly issued by the Civilian Personnel Division on the same day. The special project was in connection with the glider descent from which duPont was killed on September 11th.

Turning once again to the circumstances immediately preceding the accident:

duPont's former business associate, Bowlus, had designed an experimental type glider in 1942 in California. Due to financial difficulties it was not completed. In 1943 a new corporation known as the Albret Criz Company was formed which took over the glider and completed it. The aircraft was then given an experimental license by the Civil Aeronautics Administration and test flights were authorized by that agency. Pursuant to this authority the glider (which was never owned by the Army and was at all times the property of the civilian manufacturer) was test flown by Bowlus at the Lockheed Air Terminal in California and thereafter, upon the recommendation of duPont, taken to March Field, where it arrived on September 10, 1943. It was planned that the glider, piloted by civilian employees of the manufacturer, would be towed by an Army B-24 from California to Washington.

duPont and Colonel Gabel, who was connected with the glider program, reached March Field on September 10th. Several test flights of the glider were conducted on that day during which Bowlus acted as pilot and duPont and Colonel Gabel flew as passengers. On the following afternoon (September 11) Colonel Gabel obtained permission from Bowlus to make a familiarization flight in the glider as first pilot. He had no military authorization to make this flight. He was insistent, however, and Bowlus granted his request. One Morrison, a civilian employee of the manufacturer, was co-pilot and duPont was one of the passengers. An Army C-60 towed the glider. On this flight Colonel Gabel lost control—allegedly due to faulty pilot technique. The crash followed. duPont bailed out, but at such a low altitude his parachute did not fill. He was killed.

duPont was never at any time a commissioned officer, warrant officer, or member of the military personnel in the Army or Naval service.

1. There are strong arguments that duPont did not enjoy a military status. He did not enjoy many of the benefits of the military status, nor was he subject to many of its obligations. For example, he did not have the benefit of military pay and consequent bonuses or the benefits of the Sailors and Soldiers Relief Act, 50 U. S.C.A.Appendix, § 501 et seq.; but it is debatable whether he was subject to the Articles of War at the time of his death, although he most certainly was in his assignments overseas. Plaintiff's answering argument rests upon the contention that the character of one's service during war should determine his status as civilian or military. But the cases which have been decided in the past are to the effect that one is not in the military service until he has passed the necessary examinations, enrolled as a soldier or has been commissioned as an officer and become subject to military discipline and orders. Welts v. Connecticut Mutual Life Ins. Co., 48 N.Y. 34, 8 Am.Rep. 518; New York Life Ins. Co. v. Hendren, 24 Grat., Va., 536; Redd v. American-Central Life Ins. Co., 200 Mo. App. 383, 207 S.W. 74; Ruddock v. Detroit

Life Ins. Co., 209 Mich. 638, 177 N.W. 242; Jorgensen v. Metropolitan Life Ins. Co., 44 A.2d 907, 24 N.J.Misc. 22; Bending v. Metropolitan Life Ins. Co., 74 Ohio App. 182, 58 N.E.2d 71.

 This is a diversity case and Delaware law must apply; but there is no Delaware law on the question. My best prognosis is that I think the Delaware judges would recognize that former discussions have missed the point. The important question is the degree of volition of the insured; his status at the time of death; whether what he is doing directly ties him to the military function. There are two extreme positions as to the degree of volition and the question for inquiry should be on which side of center did duPont belong. If a man is concededly in the military service, his degree of volition is very small. If he refuses to obey orders he is court martialled and shot—an obviously small amount of volition. On the other hand, an ordinary civilian employee in peacetime has a much greater amount of volition. If he refuses to go in an airplane in order not to run the risk of death not covered by his policy, he may be dismissed from his employment—thus, while not having free choice, he nevertheless does have a much higher degree of volition.

The issue, as I see it, is whether duPont approximates one or the other of these positions. I think that he more nearly approximates one who is concededly in the military service. The stipulation of facts and the reasonable inferences therefrom show that duPont was of draft age (His conduct during the war precludes the possibility that he had any obvious physical defects which would exclude him from the physical examination, at least, under the draft.), that he was under orders from a Commanding General during war time and that he had peculiar knowledge in this field. While under his orders he had a right to refuse to ride in aircraft, I think it unreal

to say that he had a degree of volition anywhere comparable to a civilian employee in peacetime and without the remaining characteristics mentioned. His status, it would appear, at the time of his death was clearly military and again it is unreal to argue that he was not performing a military function at the time of death.

 I think, therefore, that duPont should be treated as if he were concededly in the military service.

This, however, does not effectively dispose of defendant's position.

 One line of cases decided since the war—which I believe express the majority view—hold that one even concededly in the military service can not recover under an aviation rider, similar to the one in question, unless he is a paying passenger in a regular commercial airliner. Thoma v. New York Life Ins. Co., 30 North. Co. R., Pa., 369; Green v. Mutual Benefit Life Ins. Co., 1 Cir., 144 F.2d 55; Hyfer v. Metropolitan Life Ins. Co., 318 Mass. 175, 61 N. E.2d 3; Durland v. New York Life Ins. Co., 186 Misc. 580, 61 N.Y.S.2d 700; Knouse v. Equitable Life Ins. Co., 163 Kan. 213, 181 P.2d 310. Were I convinced the cases cited in the text were wrong I would still have no freedom of choice to reject them.[1] As stated before, this is a a diversity case and the question before me is whether the courts in Delaware would reach an opposite result. I confess that I have some difficulty with these cases and for a time thought them to be unsound on the theory that, looking at the reality of the matter, the real cause of death was military service and that its happening by a military flight rather than some other reason was purely fortuitous. On further reflection, however, I have come to the conclusion my notion was incorrect because there would be as much reason behind the argument that the real cause of death was flight in a non-commercial airliner and the fact that the flight was military was like-

---

[1] The contrary authority appears to be Paradies v. Travelers Ins. Co., 183 Misc. 887, 52 N.Y.S.2d 290. Durland v. New York Life Ins. Co., supra, was decided two years after the Paradies case and by a higher ranking tribunal.

The remaining claimed contra cases, viz., Conaway v. Life Ins. Co., 148 Ohio St. 598, 76 N.E.2d 284; Janco v. John Hancock Mutual Life Ins. Co., Mun.Ct. Phila., see Legal Intelligencer, 1-14-48, are, when closely analyzed, distinguishable because of the special provisions appearing in the policies there in suit.

wise merely fortuitous. Had the insurer put in the policy that it meant to exclude from coverage military as well as civilian flights, it is obvious that duPont would be excluded.[2] It seems to me the insurer has done precisely the same thing when it excluded all flights except those as a fare-paying passenger on a commercial airliner. In either case, the contract is just as harsh and unfortunate from the insured's point of view.

As stated, even if I thought the cases were unsound I would still have to overcome the difficulty as to what a Delaware court would probably do under the doctrine of Erie Railroad Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188, 114 A.L.R. 1487. But I think the cases would be followed and applied by Delaware. It is part of our legal notice that Delaware courts pay particular attention to the decisions of the Courts of Massachusetts. The Durland case, supra, decided by the New York Court, must also be taken to represent the law of New York, another jurisdiction greatly respected by the Delaware courts. I conclude, therefore, that from an examination of all the available data (Stentor Electric Co. v. Klaxon Co., 3 Cir., 125 F.2d 820) Delaware would follow the cases cited which constitute the majority view.

2. Plaintiff advances another argument. The argument is that since death from military flight could be and was excluded by the addition to many policies of a "war rider" (which became general some years after the present policies were written by most insurance companies including defendant), it is doubtful whether death from military flight was excluded in a policy—as the ones in suit—containing no war rider. There is fallacy to this particular argument. The war rider clause covers many risks other than those of military flight. The inclusion by an insurance company of a war clause has, therefore, a significance independent of the mere exclusion of the risk of death from military flight. The addition of the war rider or clause is consequently not relevant to the interpretation of the scope of the aviation rider here.

3. Although not within the pleadings, plaintiff made an additional argument in support of recovery. Plaintiff contends that the "Occupation" clause, i. e., "This policy is free from restrictions as to occupation", is in conflict with the aviation rider and that the true intent of the aviation clause was to cover duPont for the face of the policy if death occurred as a result of occupational flying whether civilian or military. Under this view the only limitation of coverage was if death should result from pleasure flying.

This could not possibly have been the intent of the contracting parties at the time of the issuance of the policies. Such a construction would mean that the Occupation Clause was intended to read that duPont was free to engage in any occupation and he was to be free from any restriction as to manner or cause of death while he was engaged in any occupation. The agreement ignores the fact that the stamped aviation rider superseded the printed provisions for occupation; Deutschle v. Wilson, 8 Cir., 39 F.2d 406; Dudgeon v. Pembroke, 2 App. Cas. 284, 293; Farr v. Pacific Mutual Life Ins. Co., 197 La. 111, 200 So. 865; and therefore the former controls.

Submit order.

---

[2] This assumes, of course, that the opinion on the main point is correct. See D.C., 68 F.Supp. 83.