FACTORS ETC., INC. and Boxcar Enterprises, Inc., Plaintiffs-Appellees,

v.

PRO ARTS, INC. and Stop and Shop Companies, Inc., Defendants-Appellants.

No. 503, Docket 80–7692.

United States Court of Appeals, Second Circuit.

Argued Dec. 15, 1980.

Decided June 29, 1981.

Mansfield, Circuit Judge, dissented and filed opinion.

William J. Davis, New York City (Charlotte A. W. Pfahl, Alice B. Newman and

Schulman Berlin & Davis, P.C., New York City, on the brief), for appellants.

Michael C. Silberberg, New York City (Donald F. Schneider and Golenbock & Barell, New York City, Arthur Fields and Ervin, Cohen & Jessup, Beverly Hills, Cal., on the brief), for appellees.

Before MANSFIELD and NEWMAN, Circuit Judges, and CARTER,* District Judge.

NEWMAN, Circuit Judge:

The merits of this appeal concern the interesting state law question whether a person has a protected interest in publicizing his name and likeness after his death, or, as the matter has been put, is there a descendible right of publicity?[1] Despite the fascination of this question, what divides the members of this panel and forms the basis for the majority's disposition of this appeal is the more esoteric question, apparently of first impression, concerning the deference a federal court exercising diversity jurisdiction should give to a ruling by a court of appeals deciding the law of a state within its circuit. Believing that conclusive deference should be given, except in certain situations not applicable here, we reverse the judgment of this case.

## FACTS

The facts are set forth in this Court's first encounter with this litigation, *Factors Etc., Inc. v. Pro Arts, Inc.*, 579 F.2d 215 (2d Cir. 1978), *cert. denied*, 440 U.S. 908, 99 S.Ct. 1215, 59 L.Ed.2d 455 (1979) (*Factors I*), and need be recounted only briefly here. During his life, Elvis Presley, the well-known popular singer, formed a Tennessee corporation, Boxcar Enterprises, Inc., and

assigned it exclusive ownership of all rights to use for commercial purposes his name and likeness.[2] On August 18, 1977, two days after Presley's death, Boxcar granted to plaintiff-appellee Factors Etc., Inc., a Delaware corporation, an exclusive license for 18 months, renewable at the licensee's option for up to four years, to use Presley's name and likeness in connection with the manufacture and sale of any kind of merchandise. The licensee agreed to pay a royalty of 5% of sales, subject to a minimum royalty for the first 18 months of $150,000, and also subject to certain minimum royalties on specified items, for example $.08 for each poster.

On August 19, 1977, defendant-appellant Pro Arts, Inc., an Ohio corporation, published a poster displaying a photograph of Presley and the dates 1935–1977. Pro Arts had purchased the copyright in the photograph from the newspaper photographer who had taken it. Pro Arts marketed the poster through various retailers, including co-defendant-appellant Stop and Shop Companies, Inc., which sold the poster through its Bradlee Stores Division in the Southern District of New York. After communication between Boxcar, Factors, and Pro Arts, Factors brought this suit in the Southern District of New York and obtained a preliminary injunction restraining defendants from manufacturing, selling, or distributing the Presley poster and from making any commercial use of Presley's name or likeness. *Factors Etc., Inc. v. Pro Arts, Inc.*, 444 F.Supp. 288 (S.D.N.Y.1977). We affirmed that injunction in *Factors I*.

Contemporaneously with the initiation of this suit, Factors found itself in litigation on another front. The Memphis Development Foundation, an organization formed

---

* The Honorable Robert L. Carter of the United States District Court for the Southern District of New York, sitting by designation.

1. *See* Felcher & Rubin, *The Descendibility of the Right of Publicity: Is There Commercial Life After Death?*, 89 Yale L.J. 1125 (1980); Felcher & Rubin, *Privacy, Publicity and the Portrayal of Real People by the Media*, 88 Yale L.J. 1577 (1979); Nimmer, *The Right of Publicity*, 19 Law & Contemp. Prob. 203 (1954); Comment, *Transfer of the Right of Publicity:*

*Dracula's Progeny and Privacy's Stepchild*, 22 U.C.L.A. L. Rev. 1103 (1975); Note, *Lugosi v. Universal Pictures: Descent of the Right of Publicity*, 29 Hastings L.J. 751 (1978).

2. The circumstances surrounding the assignment of rights to Boxcar, a matter of some confusion, happily not of concern to this appeal, are discussed in *Factors Etc., Inc. v. Creative Card Co.*, 444 F.Supp. 279 (S.D.N.Y.1977).

in Memphis, Tennessee, to construct a bronze statue of Presley in downtown Memphis, sued Factors in the District Court for the Western District of Tennessee to prevent Factors from interfering with the Foundation's efforts to raise funds by selling eight-inch pewter replicas of the proposed Presley statue priced at $25. Factors counterclaimed for an injunction to restrain the Foundation's distribution of the statuettes and secured a preliminary injunction, *Memphis Development Foundation v. Factors, Etc., Inc.*, 441 F.Supp. 1323 (W.D. Tenn.1977), *aff'd without opinion* 578 F.2d 1381 (6th Cir. 1978). On motion for summary judgment in the Tennessee litigation, Factors obtained a permanent injunction in the District Court. However, the Sixth Circuit reversed, holding that Presley's right of publicity did not survive his death. *Memphis Development Foundation v. Factors Etc., Inc.*, 616 F.2d 956 (6th Cir.), *cert. denied*, 449 U.S. 953, 101 S.Ct. 358, 66 L.Ed.2d 217 (1980).

Thereafter Factors moved for summary judgment in the New York litigation. Appellants (hereafter collectively "Pro Arts") brought to the District Court's attention the Sixth Circuit's reversal in *Memphis Development*, contending that *Memphis Development* collaterally estopped Factors from asserting that it possessed any exclusive publicity rights to the name and likeness of Presley after his death. Implicitly rejecting this contention, the District Court (Charles H. Tenney, Judge) granted Factors' motion and issued a permanent injunction, from which this appeal has been taken. 496 F.Supp. 1090 (S.D.N.Y.1980).

## DISCUSSION

The District Court, exercising its diversity jurisdiction, 28 U.S.C. § 1332 (1976), was obliged to apply the substantive law of the state to which the forum state, New York, would have turned had the suit been filed in state court. *Klaxon Co. v. Stentor Electric Manufacturing Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). Curiously, the choice of law issue had received no attention from the parties in this litigation prior to the Sixth Circuit's reversal in *Memphis Development*. Perhaps assuming that the law governing this infringement action was the law of the place of the wrong, as appellees now explicitly contend on this appeal, the parties did not refer to choice of law rules on the prior appeal, and this Court, without discussion, simply observed that the issue of the duration of the right of publicity is "one of state law, more specifically the law of the State of New York," 579 F.2d at 220. That choice of law ruling, made in the course of affirming the preliminary injunction, does not preclude our reexamination of the point on this appeal from a final adjudication of the case, *see Diversified Mortgage Investors v. U.S. Life Title Insurance Co.*, 544 F.2d 571, 576 (2d Cir. 1976), especially now that the parties have put the choice of law issue in dispute.[3]

Factors not only contends that New York law is applicable as the law of the place of the wrong, citing *Cousins v. Instrument Flyers, Inc.*, 44 N.Y.2d 698, 699, 405 N.Y.S.2d 441, 442, 376 N.E.2d 914, 915 (1978) (*per curiam*), but also asserts that even if a "significant contacts" test were applied, *see Babcock v. Jackson*, 12 N.Y. 2d 473, 240 N.Y.S.2d 743, 191 N.E.2d 279 (1963), the significant contacts of this dispute, *i. e.*, those that "relate to the purpose of the particular law in conflict," *Miller v. Miller*, 22 N.Y.2d 12,

**3.** Factors contends that Pro Arts is raising the choice of law issue for the first time on appeal, thereby foreclosing Factors from an opportunity to develop in the trial court a factual record demonstrating significant New York contacts. *See DuBreuil v. Stevenson*, 369 F.2d 690 (5th Cir. 1966). However, Pro Arts did call the District Court's attention to the pertinency of Tennessee law on the issue of the existence of a publicity right after Presley's death. (June 19, 1980 tr. 23–24). The point was made in urging that Factors was collaterally estopped to assert possession of a publicity right by the *Memphis Development* decision, an issue we need not resolve in view of our disposition of the appeal. Moreover, it is difficult to imagine what New York contacts Factors could possibly marshal to support a claim that a New York court would apply New York law in deciding the nature of the rights acquired by Factors pursuant to the Boxcar-Factors contract.

15–16, 290 N.Y.S.2d 734, 737, 237 N.E.2d 877, 879 (1968), are with New York. Factors points not only to the sale of the infringing poster, which occurred in New York, but also to the fact that New York, as a center of communications and the locale where the publicity value of many personas has developed, has an interest in ensuring against misappropriation of a celebrity's right of publicity. Against this rather sparse showing, Pro Arts points out that Tennessee is where Presley was domiciled, Boxcar was incorporated, and the agreement between Boxcar and Factors was made. Moreover, the latter agreement specifically provides that it is to be construed in accordance with Tennessee law. We think it likely that these facts would persuade a New York court to look to the law of Tennessee. But even if a New York court would apply New York law in considering some elements of Factors' claim, such as the occurrence of an infringement, we feel certain that Tennessee law would be referred to in deciding whether Boxcar had a right of publicity in Presley's name and likeness, after his death, that was capable of being contracted for by Factors. *Cf.* Restatement (2d) of Conflict of Laws (1971) § 147, Comment (i), noting that tort conflicts rules apply to issue of conversion of property, but property conflicts rules apply to whether plaintiff has title to property allegedly converted.

All members of the panel agree that we should turn to Tennessee law to determine what rights the Boxcar-Factors contract conveyed to Factors. We find, as the Sixth Circuit concluded in *Memphis Development*, that Tennessee statutory and decisional law affords no answer to the question. We are thus brought to the issue that divides the panel: whether deference should be accorded to the decision in *Memphis Development*.

Somewhat to our surprise, there has been hardly a mention in the appellate reports of the appropriate deference a court of appeals should give to a decision made by the court of appeals of another circuit on the law of a state within that other circuit. It has frequently been observed that a court of appeals should give considerable weight to state law rulings made by district judges, within the circuit, who possess familiarity with the law of the state in which their district is located. *See* 1A Moore's Federal Practice ¶ 0.309(2), at 3125 n.28 (collecting cases). The Supreme Court has expressed similar views concerning state law interpretations by a panel of circuit judges whose circuit includes the relevant state. *MacGregor v. State Mutual Life Assurance Co.*, 315 U.S. 280, 62 S.Ct. 607, 86 L.Ed. 846 (1942). But no case appears to have turned on whether one court of appeals should defer to another circuit as to the law of a state within that circuit.[4]

In deciding *Memphis Development*, the Sixth Circuit was expounding Tennessee's version of the common law. It makes no difference that the Court was unable to find any Tennessee decisional law to guide its resolution of the issue before it, leaving it, as Judge Merritt candidly acknowledged, with "no way to assess" the predisposition of the Tennessee courts. 616 F.2d at 958. The Sixth Circuit may have lacked any sure basis for predicting what the Tennessee courts would do and therefore felt obliged to make its decision "in the light of practical and policy considerations, the treatment of other similar rights in our legal system, the relative weight of the conflicting interests of the parties, and certain moral presuppositions concerning death, privacy, inheritability and economic opportunity."

4. In *Waters v. American Automobile Insurance Co.*, 363 F.2d 684, 689 (D.C.Cir.1966), the District of Columbia Circuit seemed prepared to read Missouri cases to reach a result different from one adopted by the Eighth Circuit, but ultimately rested decision on a recent decision of a state intermediate appellate court, which was precisely in point. In *Peterson v. U-Haul Co.*, 409 F.2d 1174, 1177 (8th Cir. 1969), the Eighth Circuit expressed the view that "Federal court decisions in diversity cases have no precedential value as state law and only determine the issues between the parties." This view has been labeled erroneous by Professor Moore, 1A Moore's Federal Practice ¶ 0.309(2), at 3123 n.19, and several circuits, including the Eighth, have relied on the precedential force of their own prior rulings on state law, *id.* at 3124–25 and n.25 (collecting cases).

*Ibid.* But this recourse to such general considerations did not alter the function that the Sixth Circuit was performing. In adjudicating a state-created right in the exercise of its diversity jurisdiction the Court was "for that purpose, in effect, only another court of the State." *Guaranty Trust Co. v. York*, 326 U.S. 99, 108, 65 S.Ct. 1464, 1469, 89 L.Ed. 2079 (1945). It had no power "to declare substantive rules of common law," *Erie Railroad Co. v. Tompkins*, 304 U.S. 64, 78, 58 S.Ct. 817, 822, 82 L.Ed. 1188 (1938); it could only declare the law of Tennessee. " 'The common law so far as it is enforced in a State, whether called common law or not, is not the common law generally but the law of that State existing by the authority of that State ....' " *Id.* at 79, 58 S.Ct. at 822, quoting *Black and White Taxicab and Transfer Co. v. Brown and Yellow Taxicab and Transfer Co.*, 276 U.S. 518, 533, 48 S.Ct. 404, 408, 72 L.Ed. 681 (1928) (Holmes, J., dissenting).

Of course reasonable minds may differ as to the preferable course that the common law of Tennessee ought to follow on the merits of Factors' claim. The writer would probably uphold a descendible right of publicity, were he serving on the Tennessee Supreme Court, and perhaps if he served on the Sixth Circuit when *Memphis Development* was decided. But the issue for this Court is not which view of the merits is wiser policy; it is whether, and under what circumstances, a ruling by a court of appeals, interpreting the common law of a state within its circuit, should be regarded as authoritative by the other federal courts of the nation. The answer is illuminated by consideration of the functioning of diversity jurisdiction.

One distinct shortcoming of diversity jurisdiction is the interruption of the orderly development and authoritative exposition of state law occasioned by sporadic federal court adjudications. Except in those few jurisdictions permitting a federal court to certify an unsettled question of state law to the state's highest court,[5] a federal court's decision on state law cannot be corrected, for the benefit of the litigants in the particular case, by the state's authoritative tribunal. As long as diversity jurisdiction exists, this price must be paid. However, the opportunities for federal court departure from the normal paths of state law development should be held to a minimum, for the benefit of both the orderly development of state law and fairness to those subject to state law requirements. Both values are served by recognizing, within the federal system, the authoritativeness of decisions on the law of a particular state rendered by the court of appeals for the circuit in which the state is located. Orderly development is enhanced because the state legislature will know that the decision of the pertinent court of appeals will determine legal rights, unless superseded by a later state supreme court decision. This knowledge will focus state legislative efforts on the appropriateness of a statutory change. Fairness to the public is promoted by making clear that there is a single, authoritative answer to the particular state law issue, instead of leaving the matter subject to the varying interpretations of the courts of appeals for the several circuits.[6] If this Court were to

---

5. *E. g.*, Fla.App.R. 4.61; Md.Code Ann. § 12–601 (1980); Mass.Sup.Jud.Ct.R. 3:21.

6. Even if uniformity is achieved throughout the federal courts, the possibility remains that the courts of various states, obliged to consider Tennessee law because of their conflicts rules, might reach different predictions of Tennessee law. We think it more likely that state courts would share our interest in uniformity and accept a ruling by a pertinent federal court of appeals, subject to the same qualifications we adopt for ourselves. If in some instances a state court did not do so, that might lessen but would not eliminate the appropriateness of promoting uniform exercise of diversity jurisdiction within the federal court system. And the uniformity achieved for the period after the date of the decision of the pertinent federal court of appeals is not less worthy of achievement simply because prior to that decision other federal courts or courts of other states may have made different predictions about the course of Tennessee law. The possibility of these unavoidable departures from uniformity, just like decisions of federal or other state courts rendered before an authoritative ruling by the pertinent state's highest court, is an insufficient reason to create a needless departure from uniformity during what may be an

disregard the Sixth Circuit's view and declare that Tennessee law recognizes a descendible right of publicity, what standard of conduct should guide Tennessee residents endeavoring to determine whether their publicity rights are to be valued only for a lifetime or beyond? Of course, lawyers frequently have to advise clients concerning unsettled issues of law, but the exercise of diversity jurisdiction should not add to their uncertainty. Diversity jurisdiction, especially in its post-*Erie* incarnation, should not create needless diversity in the exposition of state substantive law. Even though the decision of the pertinent court of appeals may be revised by a subsequent state supreme court ruling, a state court will normally have the option of making such a ruling prospective only, thereby protecting any rights bargained for in reliance on the ruling of the pertinent court of appeals. That option would make little sense if the authoritative state court ruling came after divergent rulings had been made by several courts of appeals.

 We need not and do not conclude that the state law holding of the pertinent court of appeals is automatically binding upon the federal courts of all the other circuits. The ultimate source for state law adjudication in diversity cases is the law as established by the constitution, statutes, or authoritative court decisions of the state. A federal court in another circuit would be obliged to disregard a state law holding by the pertinent court of appeals if persuaded that the holding had been superseded by a

later pronouncement from state legislative or judicial sources, e. g., *Waters v. American Automobile Insurance Co.*, 363 F.2d 684, 689 (D.C.Cir.1966), or that prior state court decisions had been inadvertently overlooked by the pertinent court of appeals. Neither circumstance exists in this case. Where, as here, the pertinent court of appeals has essayed its own prediction of the course of state law on a question of first impression within that state, the federal courts of other circuits should defer to that holding, perhaps always, and at least in all situations except the rare instance when it can be said with conviction that the pertinent court of appeals has disregarded clear signals emanating from the state's highest court pointing toward a different rule. However our sense of the common law might lead us to resolve the merits of this case were we judges of the Tennessee Supreme Court, as "outsiders" with respect to Tennessee law, *Lehman Brothers v. Schein*, 416 U.S. 386, 391, 94 S.Ct. 1741, 1744, 40 L.Ed.2d 215 (1974), we should defer to the views of the Sixth Circuit unless we can point to a clear basis in Tennessee law for predicting that the Tennessee courts, when confronted with a case such as this, would conclude that the Sixth Circuit's prediction was incorrect.[7] Since we are unable to find any such indication in Tennessee law, we accept *Memphis Development* as controlling authority and conclude that after Presley's death, Boxcar had no right of publicity in Presley's name and likeness to convey to Factors.[8]

extended period beginning after a decision by the pertinent federal court of appeals and ending, if at all, only in the event of a contrary decision by the pertinent state's highest court or legislature.

7. As it happens, the author of *Memphis Development* is a distinguished member of the Tennessee bar, whose sense of what may be expected of the *Tennessee Supreme Court* surely surpasses our own. But since Judge Merritt's opinion so emphatically disclaims any basis for predicting how Tennessee will resolve the issue on the merits, we prefer to determine the authoritativeness of *Memphis Development* with regard to the territorial scope of the Sixth Circuit, rather than the heritage of the opinion's author.

8. In view of our disposition of the appeal, deferring, as a matter of *stare decisis* to the Sixth Circuit's interpretation of Tennessee law, we need not consider Pro Arts' other contentions, which include claims that the judgment in *Memphis Development* collaterally estops Factors from asserting a descendible right of publicity, that if New York law applies, New York would not recognize such a right, and that federal copyright law preempts application of state law purporting to protect such a right. Nor need we consider whether the law of a state recognizing a right of publicity may be enforced nationwide, or only within that particular state. Cf. *Goldstein v. California*, 412 U.S. 546, 93 S.Ct. 2303, 37 L.Ed.2d 163 (1973).

For these reasons the judgment of the District Court is reversed.

MANSFIELD, Circuit Judge (dissenting):

I respectfully dissent. I agree with the majority that, despite the contrary assumption of all parties in *Factors I*, New York conflict of laws analysis would call for the application of Tennessee law to determine if Elvis Presley's right of publicity survived his death. However, with the utmost of respect for our distinguished and able colleagues on the Sixth Circuit, I see no warrant, if we disagree on the merits, for blindly following its decision in *Memphis Development Foundation v. Factors Etc., Inc.*, 616 F.2d 956 (6th Cir.), *cert. denied*, 449 U.S. 953, 101 S.Ct. 358, 66 L.Ed.2d 217 (1980), any more than we would defer to the decision of any other circuit court with which we might, as has occurred on numerous occasions, disagree or conflict. The reasoning of *Memphis Development* is not in any way derived from the local law of Tennessee. Its result is inconsistent with that of nearly every other case which has considered the issue,[1] including the Sixth Circuit's own prior ruling on the preliminary injunction issued by the district court in *Memphis Development* and our opinion in *Factors I*. It is also contrary to all current views of scholarly commentators on the subject.[2]

The majority starts with the proposition that deference is owed to the "interpretations" (Maj. opin., p. 281) by a federal court of the law of a state within its jurisdiction, a principle with which I find no need to disagree. However, it then states that the "issue for this Court . . . is whether, and under what circumstances, a ruling by a court of appeals, interpreting the common law of a state within its circuit, should be recognized as authoritative by the other federal courts of the nation." (Maj. opin., p. 282). With this statement of the issue I must disagree. Here there was *no interpretation* of *any* Tennessee law by the Sixth Circuit, only a declaration of what that court thought would be a preferable general common law rule for that state. The issue before us, therefore, is whether a federal court of appeals, called upon to anticipate what general common law rule with respect to a legal question might be appropriate for a state having no law whatsoever on the subject, must adhere to the diversity decision of a sister federal court of appeals within whose boundaries the state is located. Resolution of this issue requires us to look into the reasoning behind the policy of deference which the majority would apply and decide whether it is to be applied mechanically on a geographical basis or is instead subject to any limitations.

1. Decisions holding that the right of publicity will survive death include *Hicks v. Casablanca Records*, 464 F.Supp. 426 (S.D.N.Y.1978); *Factors Etc., Inc. v. Creative Card Co.*, 444 F.Supp. 279 (S.D.N.Y.1977) (companion to the Pro Arts case which was affirmed by us in *Factors I*); *Price v. Hal Roach Studios, Inc.*, 400 F.Supp. 836 (S.D.N.Y.1975). The position of the California Supreme Court is somewhat unclear. In *Lugosi v. Universal Pictures*, 160 Cal.Rptr. 323, 603 P.2d 425, (1979), and *Guglielmi v. Spelling-Goldberg Productions*, 160 Cal.Rptr. 352, 603 P.2d 454, (1979), the majority of the Court held that the rights of publicity involved in those cases did not survive the death of the individuals in question. But it has been suggested that the ruling in *Lugosi*, on which *Guglielmi* was in turn based, depended on the finding that Bela Lugosi had not exploited his right during life. See *Lugosi, supra*, 603 P.2d at 447 n.33 (Bird, C. J., dissenting); Felcher & Rubin, *The Descendibility of the Right of Publicity: Is There Commercial Life After Death?*, 89 Yale L.J.

1125, 1126 n.5 (1980) ("Felcher & Rubin II"). Without deciding whether or not this reading of *Lugosi* is justified, it is clear that any requirement of exploitation during life is fully met in this case. See *Factors I, supra*, 579 F.2d at 222 n.11; note 4 *infra*.

2. See, e. g., Felcher & Rubin II, *supra*; Felcher & Rubin, *Privacy, Publicity, and the Portrayal of Real People by the Media*, 88 Yale L.J. 1577 (1979) ("Felcher & Rubin I"); Pilpel, *The Right of Publicity*, 27 Copyright Soc'y Bull. 249 (1980) ("Pilpel"); Note, *Lugosi v. Universal Pictures: Descent of the Right of Publicity*, 29 Hastings L.J. 751 (1978); Note, *The Right of Publicity—Protection for Public Figures and Celebrities*, 42 Brooklyn L.Rev. 527 (1976); Comment, *Transfer of the Right of Publicity: Dracula's Progeny and Privacy's Stepchild*, 22 U.C.L.A.L.Rev. 1103 (1975). And see additional authorities collected in *Lugosi, supra*, 603 P.2d at 446 n.30 (Bird, C. J., dissenting).

The weight given by higher federal courts to state law rulings made by federal judges sitting in that state results from the supposed greater familiarity that such a judge will have with the local law and the methods and tendencies of the state courts. As Wright states:

"As a general proposition, a federal court judge who sits in a particular state and has practiced before its courts may be better able to resolve complex questions about the law of that state than is some other federal judge who has no such personal acquaintance with the law of the state. For this reason federal appellate courts have frequently voiced reluctance to substitute their own view of the state law for that of the federal judge. As a matter of judicial administration, this seems defensible." C. Wright, *Federal Courts* § 58 at 271 (3d ed. 1976) [footnote omitted].

To a lesser extent a federal court of appeals might conceivably be considered to have more familiarity with the law of a state within its boundaries than would another federal court of appeals. Even this premise is open to serious question, however, for a number of reasons. Unlike a state court or a federal district court within a single state, the court of appeals of a circuit in which several states are located, which disposes of diversity appeals as only a small percentage of its business, is not likely to gain any special familiarity with the law of one of the states within its boundaries. The Sixth Circuit, for instance, physically encompasses seven different states. Of 1,823 appeals filed with it in 1980, only 212, or 11.6% (compared with an average for all circuits of 12.5%) were diversity suits and these originated not solely from Tennessee but from all seven states. See 1980 Annual Report of the Director, Administrative Office of the United States Courts, Table A–12.

These facts weaken and, indeed, may even destroy the assumption that the able Sixth Circuit has some special knowledge or expertise in Tennessee law to which deference must be paid. In this case, for instance, it would be more logical to assume that, if familiarity with a particular state's law is to be the standard for deference, the United States district judge for the Western District of Tennessee, Judge Harry W. Wellford, who in a well reasoned opinion held Elvis Presley's property right in his name and image for commercial purposes to be descendible, see 441 F.Supp. 1323 (W.D. Tenn.1977), had superior expertise with respect to Tennessee law. On the issue before us *MacGregor v. State Mutual Life Assurance Co.*, 315 U.S. 280, 62 S.Ct. 607, 86 L.Ed. 846 (1942), cited by the majority, is of no assistance for the reason that there the circuit court merely affirmed the "interpretation placed upon purely local law by a Michigan federal judge of long experience," *id.* at 281, 62 S.Ct. at 607. Here, in contrast, the Sixth Circuit did not affirm Judge Wellman's decision, but reversed it.

Moreover, it is perfectly clear that the Sixth Circuit's decision in fact in no way depended on existent local law or methods. The opinion makes no effort, as is sometimes done, to determine what other states the Tennessee courts tend to look to, *cf. Yost v. Morrow*, 262 F.2d 826, 828 n.3 (9th Cir. 1959); *Wilmington Trust Co. v. Mutual Life Insurance Co.*, 76 F.Supp. 560 (D.Del. 1948), much less to be guided by analogous principles of Tennessee law, *cf. Winston Corp. v. Continental Casualty Co.*, 508 F.2d 1298 (6th Cir. 1975). Instead, it expressly states at the outset that,

"Tennessee courts have not addressed this issue directly or indirectly, and we have no way to assess their predisposition. Since the case is one of first impression, we are left to review the question in the light of practical and policy considerations, the treatment of other similar rights in our legal system, the relative weight of the conflicting interests of the parties, and certain moral presuppositions concerning death, privacy, inheritability, and economic opportunity." 616 F.2d at 958.

It then relies on John Rawls' *A Theory of Justice* (1971) and the Restatement of Torts in evaluating these general considerations.

Clearly, familiarity with Tennessee law and practice was of no consequence in the Sixth Circuit's endeavor. We, however much "outsiders" (Maj. op., p. 283), are as fully qualified effectively to "declare" Tennessee law in such fashion as our sister circuit.

If under these circumstances we were to bow to the Sixth Circuit's declaration of Tennessee law, it would have to be for reasons other than those underlying the usual deference given to federal judges who are experienced in the local law and practice of states located within their boundaries. The majority seeks to find such a basis in the overall "functioning of diversity jurisdiction" (Maj. op., p. 282). First it argues that recognizing the authoritativeness of the Sixth Circuit's ruling would enhance the "orderly development of state law" (Maj. op. p. 282). But our refusal to be bound by the Sixth Circuit here would not affect the development of Tennessee law at all. It is conceded as a matter of settled law that any Tennessee court decision or state legislation would wipe out the future significance of both *Memphis Development* and our decision. Moreover, the notion that consistency among the circuits will better "focus state legislative efforts on the appropriateness of a statutory change" (Maj. op., p. 282) is speculative at best and perhaps ill founded. If Tennessee constituents were laboring under conflicting federal court declarations of rights and duties, the legislature would be more likely to act sooner than if all decisions were consistent.

Second, while noting that lawyers must frequently advise clients concerning unsettled issues of law, the majority argues that failure to follow *Memphis Development* would promote uncertainty and "create needless diversity in the exposition of state substantive law" (Maj. op., p. 282). This ignores the fact that our development and formation of lasting rules of common law depends heavily on healthy differences of opinion. Soundness must not be sacrificed on the altar of consistency. If two members of this panel would "probably uphold a descendible right of publicity, were [they] sitting on the Tennessee Supreme Court" (Maj. op., p. 282), and the third would certainly do so, I think we should so hold rather than retreat behind unsupportable deferential niceties.

Even the consistency achieved under the majority's rule is fortuitous and arbitrary. Had the *Memphis Development* case arisen, for example, in the Ninth Circuit and had that circuit, without reference to Tennessee law or practice, declared that Tennessee law should not allow descendibility, would we be required to follow that version unless we could prove it wrong on some local basis overlooked by the Ninth Circuit? Apparently the majority, which would "determine the authoritativeness of *Memphis Development* with regard to the territorial scope of the Sixth Circuit" (Maj. op., p. 283 n.7), would agree that such a Ninth Circuit decision would be entitled to no more weight than the usual persuasive authority of a sister circuit with which, for good reason, we might disagree. The only difference here, where the Sixth Circuit eschewed any Tennessee law basis for its declaration, is that its physical geography includes that state. In my view the lack of logic behind the majority's geographical reasoning is further demonstrated by the fact that if we had stated our holding in *Factors I* to be a declaration of our view of Tennessee law, which we would certainly have done if the parties had not at that time agreed that New York law governed, the Sixth or any other circuit would have been free to take a contrary view and thus create the very inconsistency which the majority seeks to avoid.

In the unusual situation here, where an initial court of appeals diversity declaration is in no way derived from the law or practice of the state and interprets no existing state law, we should feel free to reach a different result if sound reasons recommend it, regardless of the unpersuasive views of the sister circuit from which the initial declaration emanated. Where, as here, the Sixth Circuit itself had no Tennessee law basis for its choice and we are persuaded that other reasons dictate a contrary decision (or prediction), there is no

logical justification for a rule that would permit us to depart from the Sixth Circuit's views only upon a showing of "a clear *basis in Tennessee law* for predicting that the Tennessee courts . . . would conclude that the Sixth Circuit's prediction was incorrect" (p. 283) [emphasis added].

Turning to the merits, sound principles commend a different result from that reached in *Memphis Development* on the issue of whether Elvis Presley's right of publicity survived his death.[3] Because the issue was fully addressed in *Factors I* and because the discussion there is consistent with the vast majority of other authorities considering the problem, see notes 1 & 2 *supra*, I will not rehash at length the elements supporting the *Factors I* result. The gist of the reasoning is that the right of publicity involved here is in the nature of a valuable property right, representing the fruits of an individual's investment in the commercial development of the use of his personality. It differs from a mere right of privacy, which is purely personal in nature and hence only protected from invasion as long as the individual lives. Where the publicity right is developed through commercial investment and exploitation of the individual during his lifetime, it should be treated just the same as any other intangible property right owned by him and be devisable or descendible at death. Further, the public policy of providing incentives for individual enterprise and investment of capital and energy argues for allowing an individual to pass the fruits of his labors along to others after his death. To maintain, as *Memphis Development* did, that "leaving a good name to one's children is sufficient reward in itself for the individual," 616 F.2d at 959, is "rather harsh on those who have invested their efforts in their name, rather than in the stock market, and constitutes a rather heavy burden to impose on creativity." Felcher & Rubin II, *supra*, at 1132.

The parade of horrors conjured by the Sixth Circuit in *Memphis Development* to resist this reasoning is unreal. First, merely being a public figure (e. g., Gandhi, Napoleon, Revere, or the others mentioned at 612 F.2d at 959) is not enough to create a descendible property right. That right exists only by virtue of the individual's *commercial development*[4] of his persona and is limited to *commercial* products. Second, it is not analogous to "titles" and "offices," referred to by the Sixth Circuit, which are not alienable by law and not the result of commercial development any more than are "trust," "friendship" or "enmity," also referred to by that court. *Id.* Third, there are several answers to the Sixth Circuit's concern over how long the property interest lasts after the death of the individual and whether it is taxable. As a practical matter the ability to continue to exploit most commercially developed personalities through the sale of products after their death will last but a few years at most, diminishing because public interest in purchasing the products will decline. Further,

---

**3.** In Felcher & Rubin II, *supra*, at 1132 n.30 it is suggested that the overall result in *Memphis Development* "may be justifiable on other grounds, however. The statue of Presley, itself, being readily characterized as art, not merchandise, is protected by the First Amendment, and is outside the scope of publicity rights. . . . Replicas of the statue could conceivably fall within the same protected category."

**4.** The question of whether or not this factor is essential to survival of the right was reserved as unnecessary to the decision in *Factors I.* See 579 F.2d at 222 n.11. I would require proof of some form of exploitation along the lines outlined by the district court in *Hicks, supra*, 464 F.Supp. at 429:

". . . it would appear that a party claiming the right must establish that the decedent acted in such a way as to evidence his or her own recognition of the extrinsic commercial value of his or her name or likeness, and manifested that recognition in some overt manner, e. g., making an *inter vivos* transfer of the rights in the name (*Factors*), or posing for bubble gum cards (see *Haelan Laboratories, Inc. v. Topps Chewing Gum, Inc.*, 202 F.2d 866 (2d Cir.), *cert. denied*, 346 U.S. 816, 74 S.Ct. 26, 98 L.Ed. 343 (1953))."

See Felcher & Rubin I, *supra*, at 1613–20 and Felcher & Rubin II, *supra*, at 1130–31, for arguments in support of an even sterner application of this requirement. But cf. *Lugosi, supra*, 603 P.2d at 447 n.33 (Bird, C. J., dissenting); Pilpel, *supra*, at 257.

limits could be placed on the duration of the right by analogy to the copyright statute. See *Lugosi v. Universal Pictures*, 603 P.2d 425, 446–47 (1979) (Bird, C. J., dissenting). Whether the property right is taxable to the individual's estate will depend on interpretation of the Internal Revenue Code, but there is every indication that receipts from the sale of products after death will be taxable to the seller as gross income. Fourth, free speech would not be inhibited by continuing to restrict the sale of such products only to licensees even after death. A biography, documentary or news article would not be the kind of merchandise covered by the right of publicity.[5] Just as it is during an individual's life, the right can be treated with the flexibility needed to avoid genuine conflicts with First Amendment freedoms. *Compare Paulsen v. Personality Posters, Inc.*, 59 Misc.2d 444, 299 N.Y.S.2d 501 (Sup.Ct.1968) (protecting a Pat Paulsen for President poster as newsworthy), *with Factors I, supra*, 579 F.2d at 222 (rejecting claim that the In Memory poster was privileged as celebrating a newsworthy event).[6]

The above reasons make the *Factors I* approach the appropriate rule for Tennessee just as for New York, and I am satisfied that they would persuade the Tennessee courts, if faced with the issue, to follow the majority rule and hold that Elvis Presley's right of publicity survived his death. Additionally, it would be rational for the Tennessee courts to adopt a policy enhancing the continued growth of Nashville and Memphis as centers for the lives and activities of music industry personalities. The *Factors I* rule obviously promotes this, while the *Memphis Development* rule threatens it.

Having concluded that as a matter of Tennessee common law the right of publicity asserted by Factors in this case should be held to survive Presley's death, I address certain of Pro Arts' other arguments against affirmance, which the majority, because of its decision on deference grounds, does not consider (Maj. op., p. 283 n.8). Appellees contend (1) that Factors is collaterally estopped by the *Memphis Development* decision from maintaining this suit; (2) that federal copyright law preempts the state law of publicity in this area, and (3) that the apparent nationwide scope of the injunction issued against Pro Arts by the district court is improper. In my view none of these additional points calls for reversal of the judgment below. The first claim is that *Memphis Development*, decided more than four months prior to entry of the judgment appealed from here, created a defensive issue preclusion against Factors because the dispositive issue in that case, as here, is whether under Tennessee law Presley's right of publicity, transferred to Factors, survived his death and this issue was decided by the Sixth Circuit adversely to Factors after a full and fair opportunity for Factors to litigate the issue. With the abandonment of the mutuality of estoppel requirement in New York, *Schwartz v. Public Administrator*, 24 N.Y.2d 65, 70, 298 N.Y.S.2d 955, 959, 246 N.E.2d 725 (1969), and in the federal system, *Blonder-Tongue Laboratories, Inc. v. University of Illinois Foundation*, 402 U.S. 313, 91 S.Ct. 1434, 28 L.Ed.2d 788 (1971), Pro Arts asserts that Factors is bound by the adverse *Memphis Development* ruling and may not relitigate it here.

---

**5.** Indeed, even "fictionalized" uses of public figures' names or lives in commercial books or movies, though not qualifying as biography, may be protected by the First Amendment. See *Hicks, supra; Guglielmi, supra* (Bird, C. J., concurring). I leave the merits of this issue for a case which presents it.

**6.** In her dissent in *Lugosi*, again reaching a question not addressed by the majority, Chief Judge Bird said:

"... I am sensitive to the fact that enforcement of the right of publicity may conflict with freedom of expression in some cases. However, such a conflict is not presented in this case. Plaintiffs challenged Universal's licensing of Lugosi's likeness in his portrayal of Count Dracula in connection with the sale of such objects as plastic toy pencil sharpeners, soap products, target games, candy dispensers and beverage stirring rods. Such conduct hardly implicates the First Amendment." 603 P.2d at 449.

Under ordinary circumstances, *Memphis Development*, even if erroneously decided, might have a preclusive effect. But application of issue preclusion in a suit against different parties is not automatic; it requires weighing of policy considerations, a process left largely to the district court's discretion, *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 331, 99 S.Ct. 645, 651, 58 L.Ed.2d 552 (1979); Restatement (Second) of Judgments § 88 (Tent. Draft No. 2) (in determining whether to invoke collateral estoppel against a litigant the court may take into account "other circumstances [which] make it appropriate that the party be allowed to relitigate the issue"). In this litigation the policies behind collateral estoppel are not served by using the *Memphis Development* decision as a bar.

This is not a case where the plaintiff is simply trying, by switching adversaries and bringing a new suit, to relitigate issues already lost, a course which is to be discouraged because of the needless waste involved in multiple litigation. Indeed, *Memphis Development* is not really a *prior* determination at all. The present case was actually begun first. Both suits then proceeded simultaneously. Further, the present suit was the first and only one brought by the plaintiffs. The Memphis Development Foundation thereafter sued Factors in the Western District of Tennessee for a declaratory judgment. Factors counterclaimed for a preliminary injunction on the basis of our earlier decision. This relief was granted and the injunction was even affirmed by the Sixth Circuit, which changed its mind only after permanent relief had been granted by the district court in Tennessee. Our own circuit having first had jurisdiction over the issues and having actually adjudicated them for preliminary injunction purposes, the refusal to apply collateral estoppel below in this case cannot be said to permit *relitigation*. Moreover, the issue here may be seen as one of pure law. Application of any type of collateral estoppel to such an issue is questionable. See *McGrath v. Gold*, 36 N.Y.2d 406, 369 N.Y. S.2d 62, 330 N.E.2d 35 (1975); Restatement (Second) of Judgments § 88(1) (Tent. Draft No. 3).

Pro Arts' next contention, that in view of its valid copyright in the In Memory poster the federal copyright statute preempts Factors' state law publicity rights, was fully discussed and rejected by the district court. I agree with Judge Tenney's conclusion that the right protected here is not equivalent to any within the general scope of federal copyright law and so is not preempted by the 1909 Act, as interpreted in *Goldstein v. California*, 412 U.S. 546, 93 S.Ct. 2303, 37 L.Ed.2d 163 (1973), which controls this case. It would likewise not have been preempted under § 301 of the new 1976 Act, 17 U.S.C. § 301, if the events had occurred after 1978.

The right of publicity protects an interest which copyright does not. That interest is the individual's ability commercially to maintain and exploit his fame and persona. Copyright merely protects the holder from the taking of specific expressions or arrangements he or she had created. The right of publicity, on the other hand, protects against the unauthorized appropriation of an individual's very persona which would result in unearned commercial gain to another. If this right is not the equivalent of a copyright interest during the person's life (as Pro Arts concedes) it is equally not the equivalent after he has died and it has been devised. Other courts which have considered the preemption argument in this exact context have reached the same conclusion as that arrived at by the district court here. See *Apigram Publishing Co. v. Factors Etc., Inc.*, Civ. No. C78–525 (N.D. Ohio July 30, 1980); *Lugosi, supra*, 603 P.2d at 448 (Bird, C. J., dissenting) (issue not reached by majority opinion).

Finally, with certain limits, I would allow the district court's relief to extend nationwide. The issue here on the merits is whether or not Elvis Presley's right of publicity was devisable. Having concluded that it is, I would not fragmentize or qualify it by holding that it is to be recognized only in certain of our 50 states and not in others, depending on the local rule of the state. *Cf. Goldstein, supra*, 412 U.S. at 558, 93 S.Ct. at 2310. To do so would be to

promote multiple litigation, the very evil against which estoppel is directed. On the other hand, whether certain acts by a defendant amount to an infringement of that right in a state might depend on the local law of the jurisdiction where the wrong occurred. See, in connection with the tort of unfair competition, *Purcell v. Summers*, 145 F.2d 979, 989 (4th Cir. 1944); 4 Callman, *Unfair Competition, Trademarks and Monopolies* § 93.2 at 424; 1A Pt. 2 *Federal Practice*, Par. 0.311[1–1] at 3170 ("Some state courts will consider the law of each state where the wrong occurred.") I would therefore allow a defendant to show that conduct considered to be infringing in one state would not be so held under the rule of other states. The injunction could then be tailored accordingly. In any event, the practical likelihood of such a problem is not shown.

For the reasons outlined I believe Factors did have a valid and enforceable property right in the commercialization of Presley's persona and would therefore affirm the judgment of the district court granting it relief.