**Bessie H. WISE, for herself and as Administratrix of the Estate of Robert H. Wise, Deceased, Plaintiff,**

v.

**GEORGE C. ROTHWELL, INC., and William D. Harrington, Defendants.**

**Civ. A. No. 3840.**

United States District Court,
D. Delaware.

Aug. 22, 1974.

John M. Bader, Bader, Dorsey & Kreshtool, Wilmington, Del., and Richard L. Polin, Philadelphia, Pa., of counsel, for plaintiff.

F. Alton Tybout, Tybout, Redfearn & Schnee, Wilmington, Del., for defendants.

## OPINION, SUPPLEMENTAL FINDINGS OF FACT, CONCLUSIONS OF LAW AND FINAL JUDGMENT

LATCHUM, Chief Judge.

In this diversity motor vehicle accident case the plaintiff charged that the defendants were negligent in two respects. First, that William D. Harrington ("Harrington"), the driver of the tractor trailer owned by George C. Rothwell, Inc. ("Rothwell"),[1] in violation of 21 Del.C. § 4133(a),[2] negligently drove the Rothwell vehicle from a private road onto a two lane highway known as Route 24 at such proximity to the vehicle driven by plaintiff's decedent, Robert H. Wise ("Wise"), which was approaching

---

1. The parties in the pre-trial order stipulated that Harrington, the driver of the Rothwell truck, was operating the truck at the time of the accident within the scope and course of his employment with Rothwell. (Docket Item 68, par. C 7).

2. 21 Del.C. § 4133(a) reads in pertinent part: "The driver of a vehicle about to enter . . . a highway from a private road or driveway . . . shall yield the right of way to all vehicles approaching on the highway." In turn, right of way is defined in 21 Del.C. § 101 as: "'Right of way' means the privilege of the *immediate use* of the highway." (Emphasis supplied).

on Route 24, that a collision was inevitable. Second, that Harrington negligently failed to turn on the clearance lights of the Rothwell vehicle, making it virtually impossible for Wise to see until he had driven so close to the tractor trailer that it was impossible to avoid the collision. The case was tried to this Court without a jury and resulted in a finding that the defendants were not negligent for either reason alleged. Wise v. George C. Rothwell, Inc., 359 F. Supp. 688 (D.Del.1973).

In arriving at the no negligence finding with respect to the alleged violation of § 4133(a), this Court upon analysis of the creditable evidence determined that sufficient time existed for Harrington to proceed from the private road and to turn left on Route 24 without creating an "immediate hazard" to traffic approaching on Route 24, that is, that Harrington, acting with reasonable care and prudence, was justified in his belief that he had adequate time to make his maneuver in view of the distance of the Wise vehicle and the assumption that Wise was lawfully traveling at a reasonable speed and keeping a lookout. In applying this standard of care to Harrington's conduct, this Court, in the absence of a case directly on point by a Delaware court, was attempting to predict (always a hazardous occupation) [3] the standard of care that the Delaware Supreme Court would apply were that Court faced with the same issue. New Amsterdam Casualty Company v. First Pennsylvania Banking and Trust Company, 451 F.2d 892, 893 (C.A.3, 1971).

However, the prophetic judgment of this Court was short lived, at least with respect to this action, because on appeal of this case, a panel of the Third Circuit Court of Appeals also prophesied how the Delaware Supreme Court would rule and concluded on the basis of *dicta* appearing in Malone Freight Lines, Inc. v. Johnson Motor Lines, Inc., 1 Storey 504, 148 A.2d 770, 772 (Del.Sup.1959) that this Court had applied "an erroneous standard of care" to Harrington's conduct in proceeding from the private road of the Townsend plant.[4] The Court of Appeals held that Delaware Court decisions construing the Delaware "stop sign" law, now 21 Del.C. § 4164(c), are equally applicable to § 4133(a) and that such decisions required Harrington to "leave enough distance between his vehicle and any approaching traffic so that the approaching traffic is not in any way impeded." Thus, the judgment of this Court was vacated and the case remanded with instructions (1) to reassess the evidence in light of the standard of care the Court of Appeals found to be controlling and (2) apparently, if appropriate, to make additional and specific findings of fact and conclusions of law as to decedent's alleged contributory negligence. Wise v. George C. Rothwell, Inc., 496 F.2d 384 (C.A.3, 1974).[5]

Upon remand of this case, the Court conferred with counsel for the parties. They agreed, with this Court's approval, that a new trial was unnecessary and that the Court should make further findings [6] in the light of the Court of Appeals' opinion based on the present evidentiary record after the attorneys had an opportunity to present supplemental memoranda. Such submissions

---

**3.** Judge Kalodner in Costello v. Schmidlin, 404 F.2d 87, 91 (C.A.3, 1968), when the Court was required to make its own determination of what the New Jersey Supreme Court would probably rule in a similar case, stated: "Our experience in the past has demonstrated that this may well be described as a 'hazardous occupation.'"

**4.** Aside from the binding effect of the Court of Appeals' decision on the district courts of this circuit, the final answer of which standard of care is applicable to § 4133(a) will

have to await a definitive and final judgment of the Supreme Court of Delaware. See: Aceto v. Zurich Insurance Company, 440 F. 2d 1320 (C.A.3, 1971).

**5.** The Court of Appeals did not disturb the finding of this Court that the defendants were not negligent with respect to the charge that the tractor trailer was being operated without clearance lights.

**6.** See footnote 9, Wise v. George C. Rothwell, Inc., 496 F.2d 384, 390 (C.A.3, 1974).

have now been filed and the case is again ready for decision.

■ Applying the higher standard of care found to be controlling by the Court of Appeals with respect to Harrington's conduct to the factual findings made by this Court in 359 F.Supp. 688, it may now be conclusively presumed that defendant Harrington was negligent since he drove upon the favored highway and was involved in a collision within the danger area with the Wise vehicle traveling in the favored traffic pattern. This is so, according to the standard of care found to apply by the Court of Appeals, because it must be presumed from these facts that Harrington failed to leave enough distance between his vehicle and approaching traffic which would have enabled him to negotiate his maneuver with safety and without in any way impeding oncoming traffic.

Again turning to the evidentiary record and after carefully considering and weighing the testimony of the witnesses, their demeanor on the stand, and the documentary evidence, this Court, as directed on remand, enters the following supplemental findings of fact, conclusions of law and judgment:

SUPPLEMENTAL FINDINGS OF FACT

1. The collision occurred at a time and in an area which was heavily congested with vehicular traffic. During the period from late summer extending into November, the feed plant at Townsends received corn and soybean shipments transported to it in large grain trucks. It was a frequent and regular occurrence at the time of the year and hour of the day of the accident for trucks to be continuously exiting from Townsend's plant onto Route 24. (Tr. 29–32, 48–49, 89).[7] Indeed, Paul R. Ward, a state grain inspector working at the plant at the time of the accident, testified that approximately 170 to 180 grain trucks were unloaded and exited from the plant's private road every eight hours or on an average of about twenty trucks per hour. (Tr. 89). In addition at the time of the accident, there were a number of loaded grain trucks parked along the southern shoulder of Route 24, west of the plant exit road, awaiting their turn to enter the plant to be unloaded. (Tr. 32, 49–50, 104–5, 126, 134, 143–144, 150, 170, 444–5, 504–5). The fact that trucks were lined up in this fashion was also a frequent occurrence. (Tr. 32).

2. The presence of trucks along the southern shoulder of Route 24, parked as they were on the night in question, and the presence of a packing shed just south of the shoulder tended to obscure the view which Wise and other east-bound motorists had of exiting trucks until such a time as the exiting trucks reached close to the edge of the paved east-bound lane of Route 24. (Tr. 34, 134, 511–512, 522–523, DX 1, DX 4).

3. The maximum lawful speed on Route 24 approaching Townsend's Plant for passenger automobiles was 50 miles per hour in the absence of special hazards. (21 Del.C. § 4169(a)(2)(a); Docket Item 68, par. C 5). In addition, along the eastbound lane of Route 24 and 500 feet before reaching the Townsend Plant, there was a highway danger warning sign indicating the "Plant Entrance" and underneath of which was an advisory speed sign indicating a safe speed of no more than "40 miles per hour." (DX 2, 12, 15, Tr. 36, 49, 132, 365–6).

4. The decedent Wise was or should have been familiar with the traffic conditions at the Townsend Plant. He had worked at the Poultry Plant, a part of the Townsend Plant complex, since some time around the middle of 1966 until the time of the accident—a period of more than three years before the accident. (Tr. 15, 17, 31, 205–6). In fact, the decedent had worked in the Shipping Department of the plant on the day of the accident (October 23, 1969) from 8 A.M. until 7 P.M. (Tr. 43–44, 48, 51, 205–

_____

7. Tr. refers to the trial transcript.

206). After work the decedent stayed around the office on the shipping platform talking to his co-workers, drank a beer with them, and finally left the plant area about 8:30 P.M. (Tr. 68–69). Former Townsend employees and decedent's co-workers fully recognized the hazardous traffic conditions of Route 24 at the Townsend Plant during that season of the year. (Tr. 48–49, 133–134).

5. Within 500 feet of the point of collision, Wise drove his vehicle to his left, into the westbound lane for oncoming traffic, in the course of executing a passing movement around a tractor trailer operated by Paul Wothers ("Wothers") which was in the process of pulling over onto the southern shoulder of Route 24 to take its place as the last vehicle in the line of parked trucks awaiting to be unloaded. (Tr. 350–351, 357–359, 445–448, DX 12).

■ 6. The Wise vehicle was traveling at a high rate of speed at the time it passed Wothers' truck and approached the Townsend Plant exit. In reconciling and weighing the conflicting testimony and other evidence, the Court specifically finds that the Wise vehicle at that point and before braking was traveling at least .60 miles per hour or greater. This finding is based on the testimony of the most creditable witnesses who were at the scene. Wothers testified that Wise, who came up behind Wothers' truck and passed it as it was pulling off to the side of Route 24, "whipped out" from behind his truck into the left hand lane for oncoming traffic (Tr. 445), his "motor had speeded up . . . just like you hit the passing gear" (Tr. 446) and that he estimated the speed to the police, who investigated the accident

shortly thereafter, at 70 miles per hour.[8] (Tr. 450, 468–470). Fred Harrison, whose truck was parked on the south shoulder of Route 24 just ahead of the Wothers truck, testified that as the Wothers truck pulled behind him, the Wise car passed his truck and "sounded like a jet when he went by" (Tr. 506–508) or like "he had it [the accelerator pedal] to the floor" (Tr. 509) and that the Wise car passed him at such speed that it "shook" his truck (Tr. 507, 528) which was then loaded with 24 tons of grain. (Tr. 510). Detective Francis Mitchell, a state police officer who investigated the accident and qualified as an expert witness by training and experience (496 F.2d at 390–391), testified that it was his opinion that Wise was traveling at 75 miles per hour just prior to applying his brakes (Tr. 371) and that his opinion was based on the length of the skid marks, the damage to the vehicles involved, the location of the vehicles after impact, the areas of impact and the statements of witnesses. (Tr. 382–385; DX 6–13; PX 10 and 11). Having observed and heard Almer Rggers testified that the speed of the Wise vehicle when it passed him was going about 20 to 25 miles per hour (Tr. 150, 165, 178, 179) or 35 miles per hour or 45 miles per hour (Tr. 166–167, 178, 190–192), the Court finds that Mr. Rggers' testimony as to the speed of the Wise vehicle is incredible for the reasons set forth in 359 F.Supp. at 691–692. Frederick Petring ("Petring"), plaintiff's expert engineering consultant, testified that it was his opinion that the Wise vehicle was traveling at a speed of 45.3 miles per hour at the time the brakes were applied by Wise before the collision. (Tr. 249). However, the Court is satisfied that Petring underes-

---

8. While Wothers repudiated his estimate of the Wise car's speed at 70 miles per hour given to the investigating police officers very shortly after the accident by an affidavit prepared by plaintiff's attorney on February 14, 1972 (2 years after the accident) in which he "stated" he could not estimate the Wise vehicle's speed while behind him at over 50 miles per hour (Document Item 40),

and while at trial he testified the Wise car's speed was between 45 and 60 miles per hour (Tr. 447), the Court finds that his first estimate of speed at 70 miles per hour was closer to the 60 miles per hour speed specifically found by this Court and that his upper estimate of 60 miles per hour at trial was more nearly correct.

timated the speed by at least 15 miles per hour because of the variables and intangibles which composed his formula. Petring used the formula for obtaining his estimate as $V_1$ (speed before braking) squared minus $V_2$ (speed at impact) squared equals 30·f·s. First, after viewing the roadway on January 25, 1973 (Tr. 220) he estimated the coefficient of friction of the road surface on the date of the accident (some three years before) as .60 and assigned that figure to "f" in his formula (Tr. 250, 292) although he admitted he used a representative figure for the type of road without making any actual measurements. (Tr. 261–262). Second, he assigned to "s" in his formula the average length of the four known skid marks [9] which computed out to 64. (Tr. 282). Third, for the factor $V_2$ he estimated the speed at impact by viewing photographs of the Wise car (PX 10 and 11) and assumed, because he interpreted these photographs as showing primarily sheet metal damage, that the speed at impact was between 25 and 35 miles per hour, so that he took the mean speed at impact as 30 miles per hour. (Tr. 283). After making this assumption he found that the factor $V_1$, the speed of the Wise vehicle at braking, to be 45.3 miles per hour. However, aside from the variable coefficient and mean skid mark factors, the great intangible of Petring's formula was his estimate of speed at impact. (Tr. 295–298). He did not personally inspect the Wise vehicle to determine whether more than sheet metal damage was done; he did not see the police photographs of the vehicle until the date of trial. (DX 7–11). Those photographs show the damage caused by the collision to have been much greater than estimated by Petring and, of course, this would have substantially changed his conclu-

sion as to speed before braking had the impact speed been greater than that assumed. From the testimony and damage shown, the Court finds that Mr. Petring's opinion based on his formula and assumptions made underestimated the speed of the Wise vehicle at braking by at least 15 miles per hour.

7. Harrington in exiting from the plant stopped the Rothwell truck near the edge of the highway and then, determining that an approaching vehicle was about a quarter of a mile away, proceeded to make a left turn on Route 24. At the time that maneuver was made the headlights and clearance lights of the Rothwell truck were lit. To have reached the point on Route 24 where the collision occurred, the Rothwell truck was visible to oncoming traffic on Route 24 for at least 10 seconds. (See 359 F. Supp. at 690–691).

■ 8. Had Wise been traveling at 40 miles per hour at the recommended safe speed of the warning sign when he passed that sign which was 500 feet west of the exit road and had Wise's perception and reaction time been normal, he could have brought his vehicle to a complete stop within 178 feet, thus avoiding any impact with the Rothwell truck which was already visible on Route 24. (Document No. 176, Am.Juris 2d Desk Book).[10]

9. After finishing work at Townsend's on the day of the accident at 7 P. M. Wise stayed at Townsend's until about 8:30 P.M. (Tr. 68–69). During that time Harlin Johnson ("Johnson"), his co-worker, testified that Wise drank one beer of a six-pack. (Tr. 68). No one knows where Wise went or what he did from 8:30 P.M. until 10:25 P.M. when he was again seen by Johnson at a Seven-Eleven Store located about a mile

9. The skid marks taken from the police investigation report showed for the left front wheel 96′ 4″, for the right front wheel 92′, for the left rear wheel 35′, and for the right rear wheel 30′ 2″. (DX 12).

10. The Court takes judicial notice of the average perception reaction and stopping

distance for passenger vehicles traveling at 40 miles per hour approved by the National Conference on Uniform Stopping Distance Charts. Ryans v. Blevins, 159 F.Supp. 234, 236. (D.Del.1958), aff'd, 258 F.2d 945 (C.A. 3, 1958).

from the Townsend Plant. (Tr. 71). At that time Wise attempted to borrow money from Johnson. (Tr. 52). Johnson did not have any money with him but agreed to attempt to borrow $10 from his friend "Butch" and then to give $5.00 of the borrowed amount to Wise. (Tr. 52, 73). Johnson arranged to go borrow the money and meet Wise back at Townsend's Plant. (Tr. 73). Johnson borrowed the money and returned to Townsend's to await Wise but Wise never arrived because he was involved in the collision at about 10:45 P. M., apparently on his way to meet Johnson.

10. Wise died instantly as a result of the collision. (Docket Item 68, par. C. 3). An autopsy was performed by Dr. Judith G. Tobin, Assistant State Medical Examiner for Delaware, at 10:45 A.M. on October 24, 1969. (Tobin Dep. 5, 7).[11] In the course of the autopsy, Dr. Tobin extracted a blood sample from either Wise's heart, or the aorta or pulmonary veins. (Tobin Dep. 8). Dr. Tobin found that Wise's stomach was intact (Tobin Dep. 18–20), contained no food (Tobin Dep. 19, 20) and contained only a very small amount (about 50 cc) of gray fluid. (Tobin Dep. 19, 23). The blood sample was analyzed by Dr. Leonard Bednarczyk, State Toxicologist, (Tobin Dep. 27) and was found to contain 0.14 percent alcohol. (Tr. 410–411). James B. Kilvington, State Chemist for 25 years, testified that *any* person who has a blood-alcohol reading of 0.14 percent or indeed a reading above 0.10 percent must be considered definitely under the influence of alcohol as far as operating a motor vehicle is concerned (Tr. 483–486) because his judgment, coordination, hearing, perception and reaction faculties would be significantly impaired.[12] (Tr. 483–489). Mr. Kilvington also testified that a person weighing 175 pounds (Wise's weight—

Tobin Dep. 20–21) with a blood-alcohol reading of 0.08 percent (the equivalent of consuming five beers in a two hour period) would be adversely affected in his normal driving ability because his judgment would be dulled and his reaction time slowed perceptually below the usual norm. (Tr. 486–487, 498–499).

11. The plaintiff's expert, Dr. Leon A. Greenberg, testified that in his opinion Wise's post-mortem alcohol reading of 0.14 percent was "not a reliable or a dependable indicator of the level of alcohol in the circulating blood of a deceased person at the time he died." (Tr. 537–538). Dr. Greenberg theorized that while death stops the circulation of blood, any alcohol that is in a decedent's stomach at death continues to diffuse into the adjacent tissues and organs from which it is no longer distributed throughout the body by circulating blood. Thus, with each succeeding hour after death, blood drawn from such organs as the heart or any of the great vessels, if alcohol was present at the stomach when death occurred, will contain increasingly high levels of alcohol that are entirely unrepresentative of the level existing in the circulating blood. (Tr. 538–9, 543–546, 552). Hence, he claims as a matter of accurate practice, that post-mortem blood for alcohol testing should be taken from the artery or vein of an extremity. (Tr. 544). Dr. Greenberg further testified that Wise's post-mortem blood-alcohol reading of 0.14 was a poor indicator of the alcohol content of his circulating blood at death, (Tr. 544), because the autopsy was not performed until 12 hours after Wise died and because the blood sample was taken from the heart or large vessels of the heart when there was a laceration of the heart. (Tr. 537–538).

It must be noted that there was no challenge that Wise had a blood-alcohol reading of 0.14 percent twelve hours

---

11. Dr. Tobin's deposition (Docket Item 26) was admitted in evidence in toto. (Tr. 475).

12. Under 21 Del.C. § 4176(a), a living person whose blood has reached a blood-alcohol concentration of 0.10 percent by weight shown by a chemical analysis of a blood, breath or urine sample taken within 2 hours of the alleged offense shall be guilty of driving under the influence of alcohol.

after the accident and his death. The plaintiff made no effort to challenge the fact that a person's judgment, perception, hearing and reaction faculties are impaired by a blood-alcohol reading above 0.08 percent. Plaintiff, through Dr. Greenberg, attacked the validity of the 0.14 percentage reading itself. While the Court has been persuaded that post-mortem diffusion is a phenomenon which occurs in certain cases and which has the capacity to alter the accuracy, or "contaminate", blood-alcohol readings based upon blood samples taken at autopsy, the Court, however, finds that Wise's physical abilities to perceive and react were diminished by a significant degree from alcoholic beverage at the time of the accident. The Court so concludes because the phenomenon of post-mortem diffusion requires the presence of alcohol in the stomach of a deceased at death, and, as Dr. Greenberg stated, people simply do not die with a stomach full of strong liquor. (Tr. 568). That is because ingested alcohol is passed through the stomach into the circulating blood of a living person at a fairly rapid rate. (Tr. 568–570). Accordingly, for post-mortem diffusion to have substantially altered the validity of the blood-alcohol reading in this case, Wise must have been drinking alcoholic beverages immediately before the accident. (Tr. 69). The beer which he drank after work at 7 P.M. until 8:30 P.M. (Tr. 68, 74–76) would have passed through his digestive system and into his circulating blood. Yet plaintiff offered no evidence to indicate that *immediately* before death that Wise consumed any alcoholic beverage. Thus, the conclusion to which the Court is drawn from all the evidence is that there was very little alcohol, if any, and no food in Wise's stomach at death which could have diffused post-mortem to alter significantly the blood-alcohol reading of 0.14 percent.[13] Moreover, the Court was provided with testimony concerning the experimental results of researchers in the field of post-mortem diffusion. In most of those cases, alcohol was directly induced into the stomach of the decedent for purposes of the experiment. Admittedly, the relevancy of these experiments is not great to the situation of the instant case where the record is devoid of proof that there was any appreciable amount of alcohol in Wise's stomach at death.

There was testimony concerning another experimental research project which would seem more relevant, however. In that case, the researchers did not directly induce alcohol into the stomach, but merely compared the accuracy of blood-alcohol readings on a variety of corpses in which some blood-alcohol had been found. In the 51 cases observed in that experiment, a full 16 not only did not result in a falsely elevated reading for heart blood, but the heart blood reading was actually lower. In the remaining 35 cases in which the blood-alcohol reading for blood withdrawn from the heart was greater, only eight cases, or 16 percent, were found in which this elevation was 0.03 percent or more. (Greenberg 557–559, 572). Accordingly, even were this Court to conclude from no factual basis whatsoever that Wise had a quantity of alcohol in his stomach at death, which would have diffused post-mortem, the preponderance of the evidence in this case reveals that Wise's ability to drive was impaired by alcohol. Even allowing for the 16 percent chance found by the experimenters that the 0.14 percent reading in this case was in error by a magnitude of 0.03 percent or more, the testimony of Mr. Kelvington stands uncontradicted as to driving capacity for persons of Wise's weight with a blood-alcohol reading above 0.08 percent.

## CONCLUSIONS OF LAW

1. From the facts originally found and the supplemental facts set forth above, the Court concludes that it has been demonstrated by a preponderance of the evidence that Wise, in sever-

---

13. The investigating police officers searched the Wise car after the accident and found no alcoholic beverages or containers for such beverages in the Wise vehicle. (Tr. 371).

al respects, was negligent in a manner proximately causing the accident. In the first place, Wise violated 21 Del.C. § 4169(a)(2)(a) immediately before impact by driving his vehicle in excess of the statutory limit of 50 miles per hour, which under Delaware law amounts to negligence *per se.* Nance v. Rees, 161 A.2d 795, 797 (Del.Sup.1960).

■ 2. Wise also drove his vehicle when approaching the Townsend Plant at a speed which was greater than was reasonable and prudent under the circumstances having due regard for potential hazards then existing in violation of 21 Del.C. § 4168(a). Route 24 itself was not inherently dangerous since it was a straight stretch of a rural two-lane highway. However, the frequency of exiting trucks from the Townsend Plant, as well as the obscured view due to the packing shed and line of parked trucks, contributed to create a hazardous condition of which Wise, because of his employment at the plant, was no doubt familiar. In ignoring the plant warning sign and the advisory speed limit of 40 miles per hour, Wise operated his vehicle in an unreasonable and careless manner under the circumstances without due regard for his own safety and the safety of others. Sammons v. Rideway, 293 A. 2d 547, 549 (Del.Sup.1972).

■ 3. Wise also failed to exercise proper control and the due care of a reasonable and prudent driver when he passed the Wothers truck 500 feet before reaching the plant exit road at 60 miles per hour in an area known to be congested particularly since his view of the entrance at that point tended to be obscured not only by the Wothers truck but also by the line of parked trucks along Route 24 and the packing shed.

4. Had Wise been traveling at the advisory safe speed of 40 miles per hour when he passed the Wothers truck, had he been keeping a proper lookout as required of reasonable drivers and had his perception and reaction been normal, he would have had ample opportunity to have brought his vehicle to a complete stop within 178 feet thus completely avoiding the collision. (Document No. 176, Am. Juris 2d Desk Book).

■ 5. The Court further concludes that Wise's judgment, perception and reactions were impaired from the intake of alcohol and this was the apparent cause of his reckless speed and careless passing in an area of well-known danger. The longest skid mark left by Wise's vehicle was 96 feet before the point of impact (DX 12) which indicates the brakes were applied at that point. Given an average perception and reaction time for applying brakes of one and a half seconds (Tr. 252–253) and given the speed of 60 miles per hour found by the Court prior to applying the brakes, Wise would have covered a distance of 132 feet from the time when he first perceived the Rothwell truck until he applied his brakes. Subtracting the sum of these two distances which is 218 feet from the distance where the Wise vehicle pulled out from behind the Wothers truck (found by the Court to have been 500 feet), gives a distance of 272 feet or three seconds travel time during which Wise failed to see and react to the Rothwell truck then in plain view.[14] Had Wise been alert, keeping a lookout and had normal perception and reactions he could, even at the 60 mile per hour speed, have avoided the accident.

■ 6. Wise's excessive speed in violation of Delaware statutes in the face

---

14. A motor vehicle operator must keep a lookout and must be held to see the things which an ordinarily prudent person would see under like circumstances. Odgers v. Clark, 19 A.2d 724 (Del.Super. 1941); Carnes v. Winslow, 182 A.2d 19 (Del.Sup. 1962). Although the Rothwell truck was plainly visible when Wise passed Wothers, Wise failed to see and react until 218 feet away. Either Wise failed to keep a proper lookout due to carelessness or he was impaired from doing so by alcohol. In either event he was negligent.

of known potential danger, his failure to keep his vehicle under proper control, and his failure to maintain a proper lookout as found by the Court were direct and proximate causes without which the accident would not have occurred and there was a natural and unbroken sequence connecting his unreasonable and careless acts and omissions with the collision with the Rothwell truck. The Court further concludes that the unlawful and negligent acts and omissions were undoubtedly attributable to some impairment of his judgment, perception and reaction abilities due to his consumption of alcoholic beverages.

7. The plaintiff's claims as widow and administratrix of her husband's estate under the Delaware Wrongful Death and Survival Statutes are derivative in nature and are thus subject to all the infirmities which would exist had suit been brought by her husband if he were still living. Hence a finding of contributory negligence on the part of the decedent as one of the proximate causes of the accident also effectively bars the plaintiff's derivative claims asserted in this action. Reynolds v. Willis, 209 A.2d 760, 762 (Del.Sup.1965); Rhein v. Wark, 174 A. 2d 132, 135 (Del.Sup.1961).

8. Based on the above supplemental findings of fact and conclusions of law, the Court holds that the decedent Wise was contributory negligent in a number of respects indicated which proximately caused the accident. The plaintiff's claims derived from the wrongful death of her husband are also barred by the decedent's contributory negligence. Therefore, judgment will be entered in the favor of the defendants and against the plaintiff.

## FINAL JUDGMENT

For the foregoing reason, it is ordered that judgment is hereby entered in favor of the defendants and against the plaintiff.