**In re Joseph E. DEMBROSKY, Sr. and Patricia A. Dembrosky, Debtors.**

**Bankruptcy No. 98–15385 K.**

United States Bankruptcy Court,
W.D. New York.

May 10, 1999.

Martin A. Mooney, Diely, Dautel & Mooney, LLP, Albany, New York, for Chrysler Financial Company, L.L.C.

Mark J. Schlant, Buffalo, New York, for trustee.

Louis B. Toth, Jr., Charles Spinner, of counsel, Williamsville, NY, for debtor.

MICHAEL J. KAPLAN, Chief Judge.

The issue before the Court is whether a motor vehicle lender whose lien was not inscribed on the title certificate under New York's motor vehicle "Title" law, despite the absence of any wrongdoing by the Debtor, is nonetheless "perfected" against the Chapter 7 Trustee. I find that the decision of the District Court of this District in *General Motors Acceptance Corp. v. Waligora (In re Waligora)*, 24 B.R. 905 (W.D.N.Y.1982) is binding here, or that in the alternative it is completely persuasive of the result. The lender does not prevail under either alternative.

## FACTS

The facts are identical to those in *Waligora*. A motor vehicle lender sent everything to the Department of Motor Vehicles that was necessary to obtain a recorded lien on the title certificate for the debtor's motor vehicle. Through administrative error, the lienor is not noted on the title certificate issued by the Department. Unlike the case of *Lucas v. Pennbank*, 142 B.R. 68 (W.D.N.Y.1992) (also decided by the District Court of this District), the borrower did nothing wrongful that would result in unjust enrichment for other creditors if the lender's lien were not recognized and credited despite the lack of "notice to the world" on the title certificate.[1] The lender seems to have ignored the fact that it never received a Notice of Recorded Lien from the Department.[2]

When the District Court in *Waligora* applied 28 U.S.C. § 1652 and decided that under the state statutes there was no lien as against the borrower's bankruptcy trustee, there had not yet been even a single published decision addressing the pertinent state statutes.

Since then, one lower state court and some other courts have disagreed with the *Waligora* result,[3] but neither the highest court of this state nor any other court that could bind the District Court (the Second Circuit or the U.S. Supreme Court) has addressed the issue. See e.g. *In re Thorsell*, 229 B.R. 593 (Bankr.W.D.N.Y.1999) (Judge Bucki, of this Court, addressed this issue but distinguished *Waligora* because the certificate of title in the case before him did evidence a lien, albeit in favor of the wrong bank).

1. In the *Lucas* case, the Debtor ignored the Department's request to return the title certificate so that the error could be corrected.

2. The present lender argues that it had no reason to check for such Notice and should not be made to do so. That will be examined below.

3. The courts in *In re Beaudoin*, 160 B.R. 25, 29 (Bankr.N.D.N.Y.1993) and *In re Microband Companies, Inc.*, 135 B.R. 2, 5 (Bankr.S.D.N.Y.1991) expressly disagreed with *Wali-*

## STARE DECISIS: INTRODUCTION

Is this Court obliged to apply *Waligora*, and to leave it to the District Court to reassess *Waligora* in light of the subsequent state court cases, or is this Court obliged (or even permitted) to conduct under 28 U.S.C. § 1652 an analysis similar to the one that the District Court would conduct if it were reviewing the issue anew?

The Rules of Decision Act requires all "courts of the United States" to regard state law as "rules of decision in civil actions ... in cases where they apply." 28 U.S.C. § 1652. They apply, of course, not only in diversity cases, but also in "federal question" cases which turn upon an issue of state law. Bankruptcy courts are not included in the definition of the term "court of the United States" set forth at 28 U.S.C. § 451, but they are generally viewed as enjoying that status "derivatively" from the U.S. district court of which a particular bankruptcy court is a "unit." See U.S.C. § 151; see also *In re Volpert*, 186 B.R. 240, 245 (N.D.Ill.1995). 28 U.S.C. § 151 provides that each bankruptcy judge is "a judicial officer of the district court," but we are not within the definition of the term "judge of the United States" as set forth in 28 U.S.C. § 451.

■ When a United States district judge applies the Rules of Decision Act, she is not only free to disagree with a prior decision of her district court determining the same issue of state law, but she is obliged to reach her own interpretation of that law, and to make her own predic-

*gora.* The court in *Fitzpatrick v. Bank of N.Y.*, 118 Misc.2d 771, 461 N.Y.S.2d 703 (N.Y.City Civ.Ct.), rev'd on other grounds, 124 Misc.2d 732, 480 N.Y.S.2d 157 reached an opposite result without mentioning *Waligora*. In *In re Fisher*, 185 B.R. 457 (Bankr.W.D.N.Y.1995), the *Beaudoin* reasoning was approved, but *Waligora* was not discussed. In dictum, the court in *In re Oare*, 181 B.R. 16 (Bankr.Ct. N.D.N.Y.1995) approved *Beaudoin* and disapproved *Waligora*.

tion (if necessary) as to how the highest court of the state would rule on that question: a court of the United States is obliged "in every case to ascertain from all the available data what the state law is and apply it rather than to prescribe to a different rule, however superior it may appear from the viewpoint of 'general law' and however much the state rule may have departed from prior decisions of the federal courts." *West v. American Telephone and Telegraph Co.*, 311 U.S. 223, 237, 61 S.Ct. 179, 85 L.Ed. 139 (1940).

■ It cannot be doubted that if the United States district court has not yet applied the Rules to Decision Act to a given state law question arising in that district, a bankruptcy judge in that district is both free and bound to make a fresh assessment of how the highest court of the state would rule. See, e.g., *Munford, Inc. v. Munford*, 188 B.R. 860 (N.D.Ga.1994), rev'd in part on other grounds, 98 F.3d 604 (11th Cir.1996), cert. denied, —— U.S. ——, 118 S.Ct. 739, 139 L.Ed.2d 675 (1998). The threshold issue, which appears to be one of first impression, is whether a bankruptcy court is free to do so after the district court for that district has made a prediction as to the same issue of state law,[4] or, on the other hand, does *stare decisis* require that the bankruptcy court defer to the district court prediction?

It is important to note that the question has meaning only if there has been no intervening decision that would bind the district court. For example, it is clear

under the *Erie* Doctrine that if the highest court of the state rejects the earlier district court prediction, the district court would thereafter be bound under 28 U.S.C. § 1652 to apply the state's high court's ruling,[5] and that the bankruptcy court of that district could safely "predict" that the district court would do so[6] and avoid the need to defer to the district court, with a consequent need for an appeal thereto, to reach that result.

■ Here, a district court decision spoke some years ago under the Rules to Decision Act to a controlling issue of state law. The holding has since been disagreed with by a number of other courts, including at least one lower court of this state. But that district court decision has never been expressly or impliedly overruled by any authority that would bind the district court if the district court were now asked to look at the issue anew (such as in the event of review of the case presently at Bar). Consequently, the district court could reaffirm its earlier view despite the intervening criticism. Where does that fact leave the present Court, which is a "unit" of the District Court of this District?

### *STARE DECISIS:* THE DISTRICT COURT/CIRCUIT COURT ANALOGUE

Analogies dealing with whether a district court would be required to defer to a prior circuit court ruling in the face of subsequent lower or intermediate state

---

4. Though there might be disagreement as to the number of district judges it takes to bind a bankruptcy judge in a subsequent case, the question presented here is not affected by that disagreement so long as it is agreed that there is some point at which it can be said that the district court's view is *stare decisis;* for example, where all judges on a multi-judge district court have agreed as to the state law issue. See *Irr Supply Centers, Inc. v. Phipps (In re Phipps)*, 217 B.R. 427, 428–432 (Bankr. W.D.N.Y.1998) (finding that a bankruptcy court in a multi-judge district is bound by a prior decision of any one judge of that district).

5. As was stated in *Comm. of I.R.S. v. Estate of Bosch*, "the State's highest court is the best authority on its own law," for purposes of 28 U.S.C. § 1652. 387 U.S. 456, 465, 87 S.Ct. 1776, 18 L.Ed.2d 886 (1967).

6. *See In re Arway*, 227 B.R. 216 (Bankr. W.D.N.Y.1998) (discussing the use of the "predictive model" of adjudication in instances in which a trial court is bound not only by the decision of an intermediate court, but also by the decision of a high court whose decision is at odds with and binding upon the intermediate court).

court decisional authority are not perfect because, as described above, it is not clear that the bankruptcy court is a "court of the United States" permitted (supposedly) to apply 28 U.S.C. § 1652 afresh. But the analogies are informative.

With the exception of certain diversity cases in which there is found a constitutional imperative (for the protection of states' rights) that a United States district court not give binding authority to a prior United States circuit decision where the circuit decision is in conflict with more recent determinations of state appellate courts,[7] district courts have often deferred to prior rulings of the federal courts of appeals despite conflict between those rulings and decisional authorities from state courts other than the highest court of the state.[8] Thus, in the case of *Kerr v. Smith Petroleum Company*, the Louisiana Workers Compensation Law was implicated in a Longshoreman and Harbor Workers Compensation Act case. See 909 F.Supp. 421 (E.D.La.1995). The district court was urged to adopt the holding of a 1995 intermediate state appellate court decision, rather than a 1988 decision of the United States Court of Appeals for the Fifth Circuit interpreting the same statute. The district court refused to do so, quoting a different Fifth Circuit decision in which it was stated that "it has long been established that a legally and indistinguishable decision of [the circuit court] must be fol-

lowed by other panels of [the circuit court] and district courts unless overruled *en banc* or by the United States Supreme Court." *Id.* at 426 (quoting *Campbell v. Sonat Offshore Drilling, Inc.*, 979 F.2d 1115, 1121, n. 8 (5th Cir.1992)). The district court went on to say that "the only exception to this rule is when state law supplies the rule of law, the state's highest court has not ruled on the issue, a state intermediate court issues a decision at odds with the federal court decision, and the federal decision has not yet become final." *Id.* at 426. Because the ruling in the prior federal decision was "long since" final, the district court found itself to be "bound" to follow the earlier Fifth Circuit decision whether the subsequent state decision agreed with the Fifth Circuit or not. See *id.*

Similarly, in the case of *Perez v. Brown and Williamson Tobacco Corp.*, a conflict existed between a federal circuit court decision and a decision of an intermediate state appellate court. See 967 F.Supp. 920 (S.D.Tex.1997) The pertinent circuit decision came after the state court decision in the *Perez* Case—a potentially significant distinction for present purposes. But (for what guidance it may offer) the district court stated that "[A]dherence by a federal district court to a circuit court's '*Erie guess*' is appropriate, even when there exists a decision from the state's intermediate level appellate court that is inconsis-

---

**7.** In the case of *In re Eastern and Southern Districts, Asbestos Litigation,* the District Court undertook a brief discussion of *Erie Railroad Company v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 and its application "in instances of conflicting or sparse state authority." 772 F.Supp. 1380, 1388–1391 (E.D.N.Y.1991), rev'd in part on other grounds, 971 F.2d 831 (1992). It stated that "[W]here a conflict exists between holdings of the Second Circuit and more recent determinations of state appellate courts, this court will follow the outcome it believes the New York Court of Appeals would reach, without giving binding authority to the Second Circuit's construction of the same statute. The federal Court of Appeals is in the same position as a lower state court vis-a-vis the New York Court of Appeals in construing state

substantive law under *Erie* ... Adherence to the state decisional authority is constitutionally mandated where 'there appears to be no confusion in the [state] decisions, no developing line of authorities that cast a shadow over the established one, no dicta, doubts or ambiguities in the opinions of [state] judges on the question, no legislative development that promises to undermine the judicial rule.'" *Id.* at 1391.

**8.** No effort has been made here to find district court cases in which the present question was not addressed, but wherein a district court presumed itself free to disagree with a prior federal circuit court's prediction as to yet unresolved state law.

tent with the circuit court's resolution of the state law issue. Fifth Circuit precedents containing *Erie* predictions bind this Court unless 'a subsequent state court decision or statutory amendment . . . renders the [Fifth Circuit's] prior decision *clearly wrong*.'" *Id.* at 926. (emphasis added and citations omitted)

The case of *Nussbaum v. Mortgage Serv. Am. Co.* might be the most interesting case, in a peculiar way. See 913 F.Supp. 1548 (S.D.Fla.1995). The court stated "we appear bound to *follow state court rulings* on issues of state law, *particularly where a state court specifically contradicts an earlier interpretation of state law by a federal court.*" *Id.* at 1554 (emphasis added). After citing authority for the proposition that more recent determinations of state appellate courts should be applied rather than earlier interpretations of the otherwise superior federal court, the district court stated that "[t]hus, in this case we are compelled to reevaluate the [circuit court's] opinion in light of the more recent [intermediate state court] decision. It is our duty to determine which is the more informed pronouncement of Florida law and to adopt the result the Florida Supreme Court would likely adopt." *Id.* at 1555. But with all that said, the holding was: "*[w]e have, however, certified this Order to the [circuit court] for reconsideration of the issues involved in [the earlier circuit decision].*" *Id.*

Also to the effect that a U.S. district court is bound by a decision of its circuit court predicting state law unless a contrary decision is issued by a controlling court are *Largoza v. General Electric Co.*, 538 F.Supp. 1164 (E.D.Pa.1982); *Wise v. George C. Rothwell, Inc.*, 382 F.Supp. 563 (D.Del.1974); *DeMartino v. Zurich Ins. Co.*, 307 F.Supp. 571 (W.D.Pa.1969) aff'd, 440 F.2d 1320 (3rd Cir.1971); and *Doane v. Travelers Ins. Co.*, 266 F.Supp. 504 (E.D.Pa.1966).

We see, thus, that although district courts, unlike bankruptcy courts, are clearly "courts of the United States" empowered to make 28 U.S.C. § 1652 predictions, and although they are not a "unit" or "adjunct" of any other court from which its powers and authorities are exclusively derived, district courts may conclude that they are bound to defer to a decision from the U.S. Court of Appeals of their circuit that is in conflict with lower state court decisions (or to certify the matter to the Court of Appeals, as was done in the *Nussbaum* case).

(Although certification of the present case to the United States District Court for this District would appear to be an orderly and efficient resolution of this matter, no such procedure is provided for in the governing statutes. Compare 28 U.S.C. § 1292(b) with 28 U.S.C. §§ 151 et seq.)

### STARE DECISIS: THE CIRCUIT/CIRCUIT ANALOGUE

A further imperfect analogy involves the question of whether one United States Circuit Court of Appeals is bound to defer to a different, co-equal United States Court of Appeals' interpretation of state law, where the state involved falls within the territorial scope of the other federal circuit. Consideration of this analogy obviously offers nothing toward consideration of the matter of hierarchical precedent, but does teach that 28 U.S.C. § 1652 does not require that every federal court that encounters a particular state law issue is duty-bound to review and revise the interpretation of every federal court that previously determined that state law issue.

Important guidance has come from our own Circuit Court which, within a split panel, held itself bound to defer to a panel of a different court of co-equal rank. In the case of *Factors, Etc., Inc. v. Pro Arts, Inc.*, it was ruled that the law of Tennessee would control the outcome of the case.[9]

---

**9.** The *Factors* case was a diversity case, rather than a federal question case. But the present

652 F.2d 278 (2nd Cir.1981), *cert. denied*, 456 U.S. 927, 102 S.Ct. 1973, 72 L.Ed.2d 442 (1982). Because Tennessee lies within the Sixth Circuit and the Sixth Circuit had previously addressed the state law issue, the Second Circuit focused on the Sixth Circuit's earlier ruling. The Sixth Circuit had found that the issue was governed neither by state statute nor state case law, but it predicted how the high court of Tennessee would decide the matter.

The majority of the panel in the Second Circuit held itself not merely persuaded, but *bound* by the earlier ruling from its coordinate court. The majority's reasoning further suggests to this Court that where a "court of the United States" would find itself bound by a co-equal court's view of state law, then a subordinate [10] "unit" of a "court of the United States" is likely also bound by an earlier ruling of the court from which it derives its authority (in the absence of intervening authority that would bind even the superior court).

The obedience to the other federal court is not blind obedience. It has limits. The majority decision in the *Factors* case has won some approval elsewhere,[11] and teaches those limits. Writing for the majority, now-Senior Circuit Judge Jon Newman observed:

> Somewhat to our surprise, there has been hardly a mention in the appellate reports of the appropriate deference a court of appeals should give to a decision made by the court of appeals of another circuit on the law of a state within that other circuit. It has frequently been observed that a court of appeals should give considerable weight to state law rulings made by district judges, within the circuit, who possess familiarity with the law of the state in which their district is located.... The Supreme Court has expressed similar views concerning state law interpretations by a panel of circuit judges whose circuit includes the relevant state.... But no case appears to have turned on whether one court of appeals should defer to another circuit as to the law of the state within that circuit.

\*    \*    \*    \*    \*    \*

One distinct shortcoming of diversity jurisdiction is the interruption of the orderly development and authoritative exposition of state law occasioned by sporadic federal court adjudications. Except in those few jurisdictions permitting a federal court to certify an unsettled question of state law to the state's highest court, a federal court's decision on state law cannot be corrected, for the benefit of the litigants in the particular case, by the *state's* authoritative tribunal. As long as diversity jurisdiction exists, this price must be paid. However, the opportunities for federal court departure from the normal path of state law development should be held to a minimum, for the benefit of both the orderly development of state law and fairness to those subject to state law

---

writer believes that difference to be immaterial for bankruptcy purposes. See, for example, *Barnhill v. Johnson,* regarding the incorporation of state law into what is ultimately a federal question under the preference provision of the Bankruptcy Code, 11 U.S.C. § 547. *See* 503 U.S. 393, 112 S.Ct. 1386, 118 L.Ed.2d 39 (1992). The "strong arm" provision of the Bankruptcy Code, 11 U.S.C. § 544, on the other hand, specifically endows the Bankruptcy Trustee only with powers that a hypothetical party-in-interest would possess under the law of the state in which the bankruptcy case is pending. The courts address the two types of issues in an identical way.

**10.** To those who conclude that although the bankruptcy courts are "units" of the district courts, they are not "subordinate units" of the district courts, the issue of *Waligora* as "binding precedent" has no meaning, of course, in a 28 U.S.C. § 1652 context. See footnote 4, *supra.*

**11.** See e.g. *Abex Corp. v. Maryland Casualty Co.,* 790 F.2d 119, 125–26 (D.C.Cir.1986); *U.S. v. Maness,* 23 F.3d 1006, 1008 (6th Cir. 1994); See also *Mellon Bank, N.A. v. Ternisky,* 999 F.2d 791,· 796 (4th Cir.1993) (quoting *Factors* when adopting a foreign Court of Appeal's interpretation of state law).

requirements. Both values are served by recognizing, within the federal system, the authoritativeness of decisions on the law of a particular state rendered by the court of appeals for the circuit in which the state is located. Orderly development is enhanced because the state legislature *will know that the decision of the pertinent court of appeals will determine legal rights, unless superceded by a later state supreme court decision. This knowledge will focus state legislative efforts on the appropriateness of a statutory change. Fairness to the public is promoted by making clear that there is a single, authoritative answer to the particular state law issue, instead of leaving the matter subject to the varying interpretations of the courts of appeals for the several circuits. If this Court were to disregard the Sixth Circuit's view and declare that Tennessee law [is different from that enunciated by the Sixth Circuit], what standard of conduct should guide Tennessee residents endeavoring to determine [which view will apply in their instance]? Of course, lawyers frequently have to advise clients concerning unsettled issues of law, but the exercise of diversity jurisdiction should not add to their uncertainly. Diversity jurisdiction, especially in its post-Erie incarnation, should not create needless diversity in the exposition of state substantive law. Even though the decision of the pertinent court of appeals may be revised by a subsequent state supreme court ruling, a state court will normally have the option of making such a ruling prospective only, thereby protecting any rights bargained for in reliance on the ruling of the pertinent*

*court of appeals. That option would make little sense if the authoritative state court ruling came after divergent rulings had been made by several courts of appeals.*

\*     \*     \*  ·  \*     \*     \*

*[A] federal court in another circuit would be obliged to disregard a state law holding by the pertinent court of appeals if persuaded that the holding had been superceded by a later pronouncement from state legislative or judicial sources ... or that prior state court decisions had been inadvertently overlooked by the pertinent court of appeals .... Where, as here, the pertinent court of appeals has essayed its own prediction of the course of state law on a question of first impression within that state, the federal courts of other circuits should defer to that holding, perhaps always, and at least in all situations except the rare instance when it can be said with conviction that the pertinent court of appeals has disregarded clear signals emanating from the state's highest court pointing toward a different rule .... [W]e should defer to the views of the Sixth Circuit unless we can point to a clear basis in Tennessee Law for predicting that the Tennessee Courts, when confronted with a case such as this, would conclude that the Sixth Circuit's prediction was incorrect.*[12]

*Factors*, 652 F.2d at 281–283 (Emphasis added. Citations and footnotes omitted.)

Where one circuit "should defer" to another circuit, this writer believes he "must defer" to the court whose jurisdiction he exercises only at that court's sufferance.[13]

---

**12.** The dissent in the *Factors* case did not disagree with the principles enunciated by the majority, but argued that because there was no state statute or state case law in point, the Sixth Circuit had not "interpreted" state law, but had merely pronounced what it believed would be "preferable general common law rule for that state." And the dissent argued that in doing so the Sixth Circuit had adopted reasoning that was inconsistent with much

scholarship on the issue that had been presented to that court. Wright and Miller suggest that the Second Circuit should have determined what the New York Court of Appeals would have determined about the weight to be given the Sixth Circuit's view of Tennessee law. *Wright and Miller*, Federal Practice and Procedure, Chapter 14, § 4507.

**13.** 28 U.S.C. § 157 does not require the general order of reference. It permits it.

## STARE DECISIS: CONCLUSION

The starting point (and the ending point) for applying the above analogies to the matter at hand is the indisputable fact that the District Court's prediction in *Waligora* regarding how the high court of the State of New York would likely rule on the statutory issue may still be entirely correct. The intervening criticism of the *Waligora* result by lower state courts and by other courts may deserve sound rejection by the New York Court of Appeals and may well receive it. Indeed, if the case presently at bar is appealed and the District Court must again look at the very same issue addressed in *Waligora* (now doing so with the benefit of views that had not been available when *Waligora* was initially decided), the District Court may well reaffirm its earlier prediction as to how the New York Court of Appeals will rule.

Reasoning by analogy from the above authorities, and from *Phipps* (see footnote 4, *supra*), and because the District Court itself is free to reaffirm *Waligora*, I find that I am bound to apply *Waligora*.

## ALTERNATIVELY, WALIGORA WAS CORRECTLY DECIDED AND IS ADOPTED

■ The District Court's focus in *Waligora* was the need to interpret six related provisions of the Vehicle and Traffic Law of the State of New York in a coherent way, so as not to leave some of the provisions "virtually meaningless." The courts that have expressly or impliedly disagreed with *Waligora* have not done so persuasively.

In *Fitzpatrick v. Barone*, 215 A.D.2d 351, 626 N.Y.S.2d 220, the Appellate Term—Second Department (a court of intermediate appeal), did not mention *Waligora* or address the need to give meaning to the statutory structure as a whole, and ignored the function of the N.Y. statute as a "notice" statute. See 215 A.D.2d 351, 626 N.Y.S.2d 220 (1995).

*In re Microband Companies, Inc.* is distinguishable from *Waligora* in that the lienholder was shown as "owner" on the title certificate, obviously providing express notice of an interest and providing inquiry notice regarding the nature of the lender's interest. See 135 B.R. 2, 3 (Bankr.S.D.N.Y.1991).

In *In re Beaudoin*, 160 B.R. 25 (Bankr. N.D.N.Y.1993), and *In re Fisher*, 185 B.R. 457 (Bankr.W.D.N.Y.1995), the lenders were the victim of wrongdoing by the debtors: the lender was duly perfected in another state, but was left cold after the debtor moved to New York without the lender's knowledge and after New York issued a "clean" title applied-for by the debtor, not the lender.

As was properly noted in *Oare v. Lobel Fin. Corp. (In re Oare)*, the *Waligora* issue was irrelevant because the contest was between the lender and the debtor, not the lender and trustee. See 181 B.R. 16, 18 (Bankr.N.D.N.Y.1995) (The *Oare* case is correct to the extent that it stands for the proposition that a lender's failure to perfect never inures to the benefit of a debtor who grants a voluntary lien, be it perfected or unperfected.)

In sum, it is this writer's view that the result reached in *Waligora* has been mischaracterized and wrongly criticized.[14] As was duly recognized in *Lucas*, the *Waligora* issue is distinguishable from instances of wrongdoing by a debtor. And I believe the *Waligora* reasoning to be superior to *Fitzpatrick*, and more likely to be adopted by the New York Court of Appeals in a case, like this, which involves mere lack of diligence by a creditor in following-through to make sure it receives a "Notice of Recorded Lien," rather than involving an unjust enrichment of the debtor or of other

**14.** In fact, in *In re Males*, the Second Circuit Court of Appeals, citing *Waligora*, stated that "[w]e agree that it is the certificate of title which should control notice to third parties as to the existence of a secured lienholder." 999 F.2d 607 (2nd Cir.1993) That was, however, a case involving a different context.

creditors at the expense of the unperfected lienor.

The lender here offers no legal arguments beyond those raised in these cases. The lender does raise policy arguments, however:

1. To require the lender to review its records before the borrower has defaulted would create increased costs that would be passed on to the consumers. Here, the Debtors were never in default prior to bankruptcy.

2. To leave the lender without a lien would destroy the Debtors' credit history with this lender solely to benefit unsecured creditors who have no anticipation of recovery from this vehicle.

3. The lender's failure to check the DMV's work here was clerical error, not the kind of deliberate inaction that might warrant application of the *Waligora* holding.

Assuming arguendo that these policy arguments might properly be brought to bear on interpretation of the statutes, they are rejected. The Court does not doubt that checking the records before the account is in default is an added cost that will be passed on to consumers, but the same must be said of the title law itself, and there is a benefit that goes along with the burden. As noted in *Waligora*, New York became a "title state" in order "to provide for the orderly transfer of motor vehicles and to protect purchasers as well as lenders." *Waligora*, 24 B.R. at 908. Perhaps the transaction costs for obtaining a good lien became higher as a result (as measured against a mere U.C.C. filing). But the transaction costs for the lender and others were lowered "on the other end," so to speak: a repossessing lender, a lender/reseller, or lender/dealer accepting a trade, no longer had to deal with releases or with intervening adverse claims unless they were on the title certificate. To only go half-way in seeking a good lien is simply to fail "to take advantage of the

protection which [the statutory scheme] accords." *Id.*

The second argument confuses two disparate purposes of bankruptcy—fresh start and equality of distribution. The distributive scheme exists independent of what might be to the benefit or detriment of the debtor. Otherwise, such equalizing "forces" as preference law would not exist: we would simply direct payment to the creditors who could do the most for the debtors. The fact that the Debtors' credit record with this lender will be "destroyed" results from the inaction of the lender, and the Debtors (who did not question the fact that they received clean title). And to say that unsecured creditors "have no anticipation of recovery from the subject collateral" is disingenuous when coming, as it is, from a huge institutional lender whose legal representatives are diligent in demanding the avoiding of everyone else's unperfected liens, to increase what this lender receives on its unsecured deficiency in countless other cases. This lender often "anticipates" an increased distribution as an unsecured creditor when someone else's lien can be set aside as "unperfected." All knowledgeable lenders do.

Finally, for present purposes there is no distinction between clerical error by the lender and deliberate inaction by the creditor. The title statute is not like the Fair Credit Reporting Act which, as to the accuracy of credit reports issued by some issuers, requires only that there be reasonable procedures in place to prevent errors. Short of having been misled or otherwise victimized by the borrower, no "excuse" for the lender's failure to perfect turns a resulting benefit for other creditors into an "unjust enrichment" of those other creditors.

## CONCLUSION

The lender's Motion to Lift Stay is denied. The Trustee's Cross Motion to

Avoid the Unperfected Lien of the lender is granted.

SO ORDERED.